Argued September 24, 1952, reversed and remanded March 25,
petition for rehearing denied April 22, 1953

# SAFEWAY STORES, INC. *v.* STATE BOARD OF AGRICULTURE

255 P. 2d 564

44

*Herbert C. Hardy,* of Portland, argued the cause for appellant. With him on the brief were Cake, Jaureguy & Tooze, of Portland.

*Samuel B. Weinstein,* of Portland, Special Assistant Attorney General, argued the cause for respondent. With him on the brief was George Neuner, of Salem, Attorney General at the time this case was presented.

Before BRAND,* Chief Justice, and ROSSMAN, LUSK, LATOURETTE** and WARNER, Justices.

---

* Chief Justice when this case was argued.
**Chief Justice when this opinion was rendered.

**ROSSMAN, J.**

This is an appeal by the plaintiff from a judgment of the circuit court which quashed a writ of review issued by that court for the purpose of subjecting to its review an order (Administrative Order No. 2881) entered by the defendant, Thomas L. Ohlsen, Milk Marketing Administrator. The proceeding was instituted pursuant to § 34-1008, OCLA, which is a part of legislation which was known as the Milk Control Act (§§ 34-1001 to and including 34-1018, OCLA, as amended) until Oregon Laws, 1949, Chapter 547, Section 4, changed its name to Milk Marketing Act.

The plaintiff is Safeway Stores, Incorporated, which operates a chain of food stores, five of which are located in Salem. The defendant, when this proceeding was instituted, was the aforementioned Thomas L. Ohlsen, incumbent of the office of Milk Marketing Administrator (Oregon Laws, 1949, Ch. 547, § 1). The duties performed by the Milk Marketing Administrator were transferred by Oregon Laws, 1951, Chapter 637, Section 1, to the State Board of Agriculture. The latter has been substituted as the party defendant (respondent). Hereafter, when we use the term "the defendant" we shall mean the Milk Marketing Administrator, if the incident under scrutiny occurred prior to the time the 1951 enactment became effective; otherwise we shall mean the State Board of Agriculture. Two corporations which are engaged in the processing and distribution of milk in Salem, and to which the record refers as interveners, entered the proceeding while it was pending before the defendant. They are Curly's Dairy, Inc., and Dairy Cooperative Association. The Dairy Cooperative Association has

a plant in Salem which is known by the trade name of its products, Mayflower. We shall hereafter refer to that intervener as Mayflower and to the other as Curly.

Administrative Order No. 2881 was entered by the defendant January 18, 1950. It denied the plaintiff, according to the order's recitals,

"a license to process fluid milk in a processing plant owned by it, located in the City of Portland, * * * for distribution of said processed milk to its stores located in the Salem, Marion County, Sales Area * * *. It is hereby considered and ordered that the application of the Lucerne Milk Company, a Division of Safeway Stores, Incorporated, for a processor-distributor license to distribute and sell fluid milk and cream in the Salem, Marion County, Sales Area, be and the same is hereby denied."

The denial resulted from the defendant's view that Salem is adequately served by milk processors-distributors and that a grant to the plaintiff of its requested license would be prejudicial to the economic stability of the milk industry. Thus, it is seen that the defendant believes that he possesses economic control over milk processors. The latter pasteurize, bottle, etc., the raw milk which they obtain from producers (dairymen).

The validity of the order (No. 2881) from which we just quoted was the object of attack by the proceeding for a writ of review and is the object of attack by this appeal. The entry of the order was preceded by a hearing which the defendant conducted December 8, 1949. At the close of the hearing he entered findings of fact, and still later made the order. As we have indicated, the circuit court quashed the writ which challenged the order and thereby sustained its validity.

The judgment which quashed the writ is contested by the appeal under consideration.

The fundamental principles which govern this appeal stem from our Milk Marketing Act which became a part of our laws by the enactment of Chapter 27, Oregon Laws, Second Special Session, 1933, with its subsequent amendments. The features of that legislation are set forth and analyzed in *Savage v. Martin,* 161 Or 660, 91 P2d 273; *State ex rel. Peterson v. Martin,* 180 Or 459, 176 P2d 636; and *Sunshine Dairy v. Peterson,* 183 Or 305, 193 P2d 543.

The plaintiff owns and operates in Portland a milk processing plant known as the Lucerne Milk Company. That name is merely the appellation which has become attached to the plant and does not denote a separate corporation nor any other form of entity. The product of the plant is called Lucerne milk. The Lucerne plant processes the milk which the plaintiff sells in its Portland stores. The defendant does not question any detail or feature of the plant such as cleanliness or suitability. Lucerne milk, the product of the plaintiff's plant, contains 3.8 per cent butterfat and is sold in paper cartons at the same price as others demand for 3.5 per cent milk contained in bottles. The plaintiff does not operate a delivery system and, hence, its customers carry away the items purchased, such as milk. Mayflower and Curly milk contains not less than 3.2 per cent and not more than 3.5 per cent butterfat. When it is sold in paper containers, an extra charge of one half cent per quart is exacted. Both of those concerns operate delivery systems.

The plaintiff has no processing plant in Salem and is prohibited, under the defendant's rulings, from supplying its Salem stores with milk processed in its

Portland plant. The defendant promulgated a regulation, reading:

> "No milk dealer or distributor who is licensed for a specific market and sales area may lawfully purchase milk from producers not qualified for the market in which the said milk dealer or distributor is licensed, nor may such distributor or milk dealer lawfully sell to any other person, distributor or milk dealer not licensed in said market any portion of said fluid milk and/or cream suitable for the bottle and can trade for resale, without first obtaining the written consent of the Department of Agriculture, Milk Control Section."

In employing that rule, the defendant deems that the delivery of milk from the Lucerne plant to any of the plaintiff's stores is a sale. That construction has prevented the plaintiff from having milk purchased in the Salem production area processed in the Lucerne plant and then returned to Salem for sale in the plaintiff's Salem stores. Thus, its Salem stores can not sell milk bearing the trade name Lucerne.

Since the plaintiff is prohibited by the defendant from bringing to Salem milk processed in its Portland plant, whether or not it was purchased in its raw condition in the Salem production area, it has been forced to supply its Salem stores with milk purchased from Salem processors. Curly supplies it with about 40 per cent of the milk it resells in its Salem stores and Mayflower with the remainder. Since no milk is available in Salem containing more than 3.5 per cent butterfat, the plaintiff cannot offer its trade milk containing the butterfat present in its Lucerne milk, that is, 3.8 per cent. We said that milk is not available in Salem containing more than 3.5 per cent butterfat. The defendant himself declared during the hearing, "There is no 3.8 milk being sold in Salem." More than

one milk dealer offers to the trade in Portland milk containing 3.8 per cent butterfat, and the record shows that "quite a little" 5 per cent milk is sold in that city.

November 28, 1949, the plaintiff requested of the defendant that

"permission be granted to Safeway Stores to sell Lucerne milk and cream in its Salem stores which has been processed and bottled in the Safeway Lucerne plant in Portland.

"In making this request, we wish it to be clearly understood by you that the amount of milk which will be sold in the Salem stores will be acquired from producers already holding a quota upon the Salem market."

In ruling upon that request, the defendant declared:

"I consider this request to be an extension of your sales area to include the Salem sales area under your present processor-distributor license.

"In view of the fact that such a move would to some extent affect distributors presently licensed in the Salem sales area, I deem it advisable to hold a hearing upon your application. * * *"

As a result of that ruling, the hearing was held which we have mentioned. It occurred December 8, 1949.

To make matters clear, we add that what the plaintiff wished to do was (1) purchase from Salem producer quota holders its daily milk requirements; (2) transport the Salem-purchased milk to its Portland Lucerne plant; (3) process the milk in that plant; and (4) return the processed milk to Salem and deliver it to its Salem stores. The plaintiff's protest that no hearing was necessary was overruled. Its proposal to purchase the needed raw milk in the Salem production area was made in order to satisfy the situation re-

sulting from the fact that the defendant has placed Portland and Salem in separate milk production areas.

■ All five of the plaintiff's Salem stores possess licenses issued by the defendant which authorize them to sell milk. The plaintiff's Portland processing plant [Lucerne] has a license issued by the defendant which authorizes it to process milk for sale in the Portland market area only. The latter includes all of Portland and the five-mile contiguous territory. The Salem market area includes, in addition to the city, the five-mile zone immediately adjacent to it.

We shall now consider the first assignment of error. It reads:

> "The Court erred in quashing and dismissing the writ and sustaining the administrator's Order No. 2881, for the reason that the administrator had no power or jurisdiction under the Milk Control Act to prevent the appellant, a licensed milk dealer on the Salem market, from processing milk in its Portland plant which it had purchased from producers holding a quota on the Salem market and which appellant would sell in its licensed stores in Salem."

It has been argued, not, however, by the defendant: "The plaintiff has not challenged the right of the defendant to inquire whether the granting of the license would adversely affect the market." The issues which underlie this proceeding had their genesis November 28, 1949, when, as we have indicated, the plaintiff applied to the defendant for permission to sell in its Salem stores milk purchased in that area and processed in the Portland Lucerne plant. November 29, 1949, the defendant replied to the application by announcing that he would conduct a hearing upon it. The plaintiff at once objected. It protested that its application

called for no hearing and required the defendant to exercise no powers except his common licensing power. It renewed its protest and objections upon the opening of the hearing. At that time its counsel declared:

"* * * Therefore, we wish the record to show clearly, first, that this hearing was not requested by Safeway Stores, Incorporated, and, second, that we are participating in this hearing under a full reservation of rights to challenge the validity of this hearing in all particulars, and to challenge the Administration's determination of the necessity therefor."

The plaintiff's petition for a writ of review, in specifying its charges of error against the defendant, included this:

"Section 34-1006, O. C. L. A., specifies all the grounds upon which a license may be denied, and defendant did not deny said license on any of the grounds therein specified."

The charge just quoted, as will appear later, ushered in the entire case. It is crucial. We are satisfied that the record calls for a determination as to whether or not the defendant may deny a license to a would-be processor solely upon the ground that he [defendant] believes that the community which the newcomer wishes to serve has adequate milk service. In fact, we have no choice except to determine that very issue; for if the Milk Marketing Act does not authorize the defendant to afford present processors the benefit of restricted competition, then the findings of fact entered by the defendant, which are based solely upon the premise that Salem has a sufficient number of processing plants, demand that the challenged order must be vacated. The findings will be quoted in a later part of this opinion. The fact that the defendant denied the

plaintiff's application for no reason other than a finding that a grant to the plaintiff of its application would disturb existing conditions requires us to construe the Milk Marketing Act and reverse the challenged order, if the Act does not confer upon the defendant economic control over processors. Surely, if the findings of fact do not support an order which is challenged by a writ of review, the reviewing court must vacate the order: *School District No. 68 et al. v. Hoskins, et al.,* 194 Or 301, 240 P2d 949. A writ of review calls upon the court to match the findings of fact with the agency order and if the former do not justify the latter, the order must be held illegal. Thus, this case calls for us to construe the Act for the purpose of determining whether or not the findings afford a proper basis for the order of denial.

We shall now review the evidence which was presented to the defendant. We make the review, not for the purpose of altering or supplanting the findings of fact which he entered, but only for the purpose of facilitating an understanding of them.

In applying the surplus milk formula of § 34-1013, OCLA, and in thereby determining the net amount payable to producers in the Salem area, the defendant has created in the Salem sales market two pools, as that term is employed in § 34-1013; one is known as the Curly pool and the other as the Mayflower pool. Each pool is recognized by the defendant and those concerned with it as though it were a separate market. After an accounting has been had for its surplus, each pool determines the net amount receivable by those who supply milk to it. Upon the other hand, there is only one pool in Portland, and its results govern the net amount which all producers in the area receive.

Unlike the situation in Portland, there is no single pool for Salem. To make matters clear, the defendant has not employed in Salem his pooling power in such a way that all producers share equally the ill effects of total surplus. The Salem production area, as fixed by the defendant, embraces the counties of Lincoln, Benton, Linn, Polk, Marion and Yamhill, although it shares the three last named counties with the Portland production area. The milk which Curly and Mayflower process comes from the Salem production area. In the recurring accounting periods, the surplus milk in Curly's pool and that in the Mayflower pool is dealt with separately. The plaintiff, if its requested permission is granted, will enter the Salem production area and purchase enough milk from producers in that area to supply the needs of its five Salem stores. Its operations will be independent of the Curly and the Mayflower pools unless the defendant makes readjustments. The producers who will sell it milk will be free from the readjustments in return to which the producers are subject who supply Curly and Mayflower.

The plaintiff is not seeking to take out of Salem or bring into it any milk that is not already produced for that market. All that it wishes to do is to process in Portland and then return to Salem milk produced in Salem but now processed in the plants of the interveners. If its plant, instead of being in Portland, was in Salem, the effect of the plaintiff's contemplated operations upon milk production would be no different.

The plaintiff proposes, as we have said, to haul the milk to Portland which it will purchase in the Salem area, process it in the Lucerne plant and then deliver the processed milk to its Salem stores. The plaintiff will sell its 3.8 per cent milk in paper containers at the

same price as 3.5 per cent milk which others place in bottles.

Although the findings state that "there are at the present time seven processor-distributors and producer-distributors duly licensed in the Salem market who have modern equipment and facilities of adequate capacity to serve all of the needs of the same market," the evidence reveals the names of only two of them, that is, Curly and Mayflower. It divulges nothing about the remaining five. It does not indicate whether those five have plants or delivery facilities. It seems clear that only Curly and Mayflower have sizeable volume of business. Curly's Dairy, Inc., is a corporation of which Mr. Hans Hoffstetter is the president. The manager of Mayflower is Mr. Will W. Henry. The Dairy Co-operative Association, to which we have been referring as Mayflower, is a form of cooperative enterprise in which the producers who supply it with milk gain or lose in the event profits or losses occur in the processing, administering and delivery phases of the enterprise. Producers who supply Curly do not share in the gains or losses arising from the conduct of that business. They are paid the prices established by the defendant; subject, of course, to readjustment if the period's operations result in a surplus which must be sold at a low price.

The plaintiff's total purchases of milk for its Salem stores was 2.37 per cent of the entire amount of milk processed in five Salem distributing plants. We have mentioned the fact that the findings state that there are "seven processor-distributors and producer-distributors duly licensed in the Salem market." When we said that the plaintiff's purchases aggregated 2.37 per cent of the total of the five Salem distributing plants, we

limited ourselves to the five because the only information released by the defendant concerned them. The record warrants a belief that the volume of the two licensees who are not included among the seven is negligible.

An item of evidence which was developed in the hearing of a previous application, and which was made a part of the record of this case, follows: "There is not any very great difference between the cost of operating on the Portland market and on the Salem market so far as the processing and delivery, selling and administrative expenses are concerned." Other evidence indicated that the difference is negligible. One witness upon that subject couched his testimony in such uncertain terms that we are unable to determine whether it supplements the statement just quoted or is adverse to it.

Mr. Henry and Mr. Hoffstetter stated that if the plaintiff withdrew its purchases from their plants and offered in its Salem stores 3.8 per cent paper-contained milk at the same price as 3.5 per cent Salem-bottled milk, the effect upon their volume and net income would be adverse. Both dwelled upon the fact that if the plaintiff withdrew its purchases from their plants, the volume of milk processed by them would be less, and claimed that as a result of their smaller volume their costs per unit [such as a quart] would increase. Mr. Henry, especially, predicted that diminishing returns would have the ultimate effect of compelling producers to accept a lesser price for their milk. Neither was certain that if the plaintiff is authorized to sell 3.8 per cent Lucerne milk in Salem at the same price as 3.5 per cent local milk they will find it necessary to meet the plaintiff's competition. Mayflower, which has a plant

in Portland, has not met the plaintiff's competition in that city, except to charge for milk in paper containers the same price as for milk in bottles. Producers in the Portland area have not suffered a reduction in price on account of the plaintiff's activities.

■ We shall confine our review of the evidence to the foregoing. The transcript contains additional facts, but, since they received no mention in the defendant's findings, we are not at liberty to consider them. We shall presently quote the findings of fact. We are bound by the latter to the extent that they are supported by substantial evidence.

The plaintiff, it will be observed, wishes to deal with the Salem trade in a manner different from Curly and Mayflower. For example, its milk will contain 3.8 per cent butterfat and will bear the name "Lucerne". The milk now available in Salem aims to contain 3.5 per cent butterfat but at times has only 3.2 per cent. At present, milk purchased in paper cartons in Salem costs the buyer one half cent more than milk in bottles. The plaintiff will eliminate that differential if the buyer chooses Lucerne milk. The latter, unlike Curly's and Mayflower's, will not be available through delivery service. In lieu of milk delivery, the plaintiff will give its customers more butterfat. In buying from producers, the plaintiff will not be subject to the effects of pools, unless the defendant alters his regulations whereby some producers supply the Curly pool and others the Mayflower.

Following are the findings of fact entered by the defendant:

"This matter came on regularly before me on the application of Lucerne Milk Company, a division of Safeway Stores, Incorporated, for a license

to process fluid milk in a processing plant owned by it, located in the City of Portland, Oregon, and for distribution of said processed milk to its stores located in the Salem, Marion County, Sales Area.

\* \* \* \* \*

"1. That Section 34-1009, O.C.L.A., vests power and authority in the Milk Marketing Administrator to classify licenses, with power to issue licenses to dealers, to stores or manufacturers, to sell milk limited to a particular city or village, or to a particular market or markets within the state, and may define what shall constitute a natural marketing area.

"2. That Official Order G. O. No. 127, amending General Order G. O. No. 116, defines and prescribes the Portland Sales Area, and that the Lucerne Milk Company, a Division of Safeway Stores, Incorporated, for sometime prior and at the time of the hearing held a processor-distributor license, empowering it to process, sell and distribute fluid milk and cream in the Portland Sales Area as defined by said order.

"3. That Official Order G. O. No. 62 defines the Marion County Marketing Area No. 1 as that area within the corporate limits of the City of Salem, Oregon, and the area within lines paralleling the boundary line of the City of Salem, drawn five miles distance outside therefrom, and the extension of said lines necessary to enclose the area.

"4. That the retail stores owned and operated by Safeway Stores, Incorporated, located in the Salem Sales Area have at all times been supplied by duly licensed distributors located in said Salem, Marion County, Sales Area, with the daily requirements of fluid milk and cream sold by said Safeway Stores.

"5. That said licensed distributors for the Salem, Marion County, Sales Area have at all times adequately supplied the Safeway Stores in Salem with its bottled milk and cream requirements, of

accepted standards and quality, and in accordance with price schedules and other regulations in effect in said market.

"6. That there are at the present time seven processor-distributor and producer-distributors duly licensed in the Salem Market who have modern equipment and facilities of adequate capacity to serve all of the needs of the said market.

"7. That the proposal of the applicant to receive milk from producers located in and qualified for the Salem Sales Area, for processing in their Portland plant, and then to transport and distribute such milk to its Salem stores, would entail additional and increasing handling costs, and is not in the best interests of a stabilized market, nor in the interests of the public.

"8. That the granting of an additional distributor license will jeopardize the maintainance [sic] of the present distributive facilities now adequately supplying the needs of the consumers in said Salem Sales Area, and that by the displacement of sales of the Salem licensed distributors now processing and bottling the requirements of milk and cream of Safeway Stores in Salem, would to some extent increase their processing and distributing costs through a decrease in their volume, and thereby tend towards an increase through a decrease in their volume, and thereby tend towards an increase in the price to the consumers, or a less price to the producer, or both, which in the judgment of the undersigned is not in the public interest.

"9. That the proposal of the applicant to take only its requirements from producers in Salem, to process same in its Portland plant, and then distribute same to the consumers through its stores, will in the judgment of the undersigned throw the burden of the surplus required in said market, so as to meet the varying demands of the public, upon all producers other than those supplying Safeway Stores, creating discrimination and favoritism, and

will tend towards a demoralization, both of the production and distribution of fluid milk in said market.

"10. That the introduction of paper containers has undoubtedly facilitated shipment of fluid milk and cream to places far removed from processing plants, and it is the judgment of the undersigned that the granting of this application would tend towards monopolization of the distribution of fluid milk and cream by large metropolitan processor-distributors, ultimately forcing small distributors out of business. It is the opinion of the undersigned that such tendency is not in the public interest."

We shall pause a moment to analyze some of the findings. We think that it is evident that statements such as "not in the public interest" are not findings of fact. If Findings 4 and 5 mean no more than that the plaintiff's five Salem stores have been regularly supplied by the interveners with a sufficient quantity of milk and at prices which do not violate the defendant's regulations, they are in accord with the evidence. The findings, however, do not reflect the fact that the defendant prevents the plaintiff from procuring for its Salem stores milk containing 3.8 per cent butterfat. Likewise, they do not mention that the plaintiff wishes to sell to its Salem customers milk under its established trade name of Lucerne and offer it in paper containers at the same price as others charge for bottle-contained milk. The seventh finding says that the plaintiff's plan "would entail additional and increasing handling costs". But it does not disclose whether the "additional and increasing handling costs" will be incurred by the plaintiff, the interveners or some other milk dealer. We think that the finding was written because the transportation of the Salem-produced milk to the Portland plant and its return to Salem in processed form would subject the

plaintiff to "additional and increasing handling costs"; that is, to the transportation expense. However, since the Portland plant would thereby secure a larger volume, the cost of processing per unit [such as a quart] would be reduced. It may be that the operation in its entirety would be for the plaintiff an economy measure. No one can determine from the scant evidence in the record the net result which the contemplated venture would yield. We are unable to ascertain from the eighth finding how the plaintiff's operations, if authorized by the defendant, could result in "a less price to the producer". The defendant, as we shall presently show by quotation from the Milk Marketing Act, has the power to prescribe the price which milk dealers must pay to milk producers. Unless the defendant orders milk dealers to pay milk producers a less amount than at present, there can be no change in the producer's receipts. At the time of the hearing § 34-1012 said:

"* * * the board shall, by order fix the minimum wholesale and retail prices to be charged for milk handled and sold within the state for home consumption in fluid form and including the following classes: (a) By producers * * * to milk dealers; * * *."

The eighth finding, now under consideration, says that if the plaintiff withdraws its purchases from "the Salem licensed distributors now processing and bottling the requirements of milk and cream of Safeway Stores in Salem," those two processors [Curly and Mayflower] would suffer an increase in "their processing and distributing costs through a decrease in their volume." From that fact the defendant drew the conclusion of which we have already taken notice; that is, that the adverse effect suffered by the returns of the

processor-distributors may eventually be passed on to the producer in the form of lower prices for raw milk. But the finding does not indicate that the plaintiff is forever bound to purchase its requirements from Curly and Mayflower. As will presently appear, we deem that finding irrelevant, but, since the defendant's order is based upon a claim that he can afford processors the benefit of restricted competition, we shall pause for a moment upon the finding. If the plaintiff transfers its purchases from Curly and Mayflower to any other Salem processor, whether or not its application is granted, the evil consequence of which the findings speak would occur; that is, the transfer of the plaintiff's business from Curly and Mayflower to some other processor would "jeopardize the maintenance of the present distributive facilities now adequately supplying the needs of the consumers in said Salem Sales Area." Thus, Curly and Mayflower would suffer as badly if the plaintiff transfers its purchases to some other Salem processor as if it does its processing in its Portland Lucerne plant. Or, if the plaintiff discontinued the sale of processed milk and sold only nonprocessed [see *Savage v. Martin*, 161 Or 26 666, 667 and 707], no Salem processor would secure any business whatever from it. From the above, it is evident that the conclusion drawn by the eighth finding [that producers may receive a smaller price for their milk if the plaintiff's application is granted] can be sustained only if (1) there is no other source in Salem to which the plaintiff can resort for processed milk [the findings state that there are seven processors in Salem], or (2) the plaintiff is bound forever to make its purchases from Curly and Mayflower. One more observation: If the plaintiff shifted its purchases and bought all of its requirements from Curly and nothing from Mayflower,

the economy of both of those concerns would be materially affected. If the plaintiff made that shift in its purchases, Curly would gain the benefit of augmented volume and its pool would possibly contain no surplus whatever. Upon the other hand, Mayflower's volume under such conditions would suffer a severe decline and the surplus in its pool would be increased to an extent very hurtful to the producers who supply it. We shall proceed no further with an analysis of the economy which underlies the eighth finding. The foregoing analysis yields a preview of the results that would follow if this court held that the defendant has economic control over processors and can prevent dislocations in the conditions under which they operate. Such a holding would enable him to prescribe for Salem a static condition and that, of course, would be tantamount to an order banning enterprise. We will now consider the ninth finding. The plight it mentions results from the fact that notwithstanding the demands of § 34-1013 the defendant has failed to provide in Salem "for the pooling and averaging of all returns from the sales of fluid milk * * * and the payment to all producers of a uniform pool price * * *." His failure to comply with those requirements has created for the plaintiff an opportunity to purchase raw milk from producers without being subject to the after effect of pools and their surpluses. The fault that has produced this favorable opportunity for the plaintiff is that of the defendant, and it cannot be shifted to the plaintiff by pointing out that if its application is granted the plaintiff will seize the opportunity. The tenth finding, we believe, is unsupported by any evidence in the record, and the respondent seemingly so concedes, for his brief says: "Finding No. 10 is in a large measure a conclusion based largely upon the

knowledge of the Administrator * * *. If, however, this finding is not supported, other findings are amply supported by competent evidence, and sustain the judgment of the trial court."

The foregoing are the facts. The question now occurs: Does our Milk Marketing Act confer authority upon the defendant which rendered it lawful for him to deny the plaintiff the right to ship to and sell in its Salem stores milk purchased in the Salem area and processed in its Portland plant.

The Milk Marketing Act is not lengthy and most of its provisions are readily understandable. We shall now review the Act.

The preamble of the Act received mention in previous opinions of this court. It speaks of the importance of the milk industry and declares that "the present economic emergency is in a large part the result of a disparity between the prices of milk and cream and other commodities." It notes that destructive trade practices had developed in the milk industry and that they constituted a menace to the health and welfare of the people. In order to protect the well-being of the people, it declared the milk industry "a business affecting the public health and interest." Having made those pronouncements, the preamble closed with a declaration that the milk industry "should be supervised and controlled in the manner hereinafter provided." We direct attention to the words just quoted. They were emphasized in *Sunshine Dairy v. Peterson,* supra. The decision just cited also pointed out that the preamble of a statute is "not an essential part thereof, and neither enlarges nor confers powers." We proceed now into the enactments of the act.

The first section, 34-1001, OCLA, as amended, is made up of definitions. Section 34-1002, as amended, creates the authority which administers the act. Section 34-1003, as amended, specifies the following as the powers which the agency has: (a) authority to confer and cooperate with similar agencies of the federal and state governments; (b) to investigate with Oregon State College all matters pertaining to the milk industry; (c) "to supervise and regulate the milk industry of the state, including production, as defined in section 34-1013 hereof * * *"; (d) to act as arbiter of controversies that arise between those engaged in the industry; (e) "to examine into the business, records and accounts of any milk dealer" and, by the use of subpoenas, to compel dealers to produce their records; (f) to take depositions; (g) to adopt and enforce needed rules and regulations; and (h) "to exercise such other powers as hereinafter are specified." Sections 34-1004, 34-1005, 34-1006, 34-1007 and 34-1008 concern licensing. The first of those sections renders it unlawful for milk dealers to engage in business without a license. The next prescribes the information which the defendant can require an applicant for a license to furnish. The third governs the refusal, suspension or revocation of licenses. The fourth prescribes the amount of license fees. The fifth, being the one to which the plaintiff resorted when it instituted this proceeding, makes provision for judicial review of orders which refuse, revoke or suspend licenses. Before making a summary of § 34-1009, we will go on to the remaining sections. Section 34-1010, as amended, requires licensees to maintain records containing the information demanded by that section. Section 34-1011 declares that licenses issued by the defendant shall be in addition to others required by other laws and munic-

ipal ordinances. Section 34-1012, as amended, author-izes the defendant to regulate prices and prescribes the procedure which must be employed in price fixing. The concluding part of the section prescribes the pro-cedure which the defendant must pursue in denying an application for a license or revoking one. Section 34-1013, as amended, is concerned with surplus milk. Sec-tion 34-1014 enables the defendant to issue subpoenas and provides for enforcing compliance by witnesses with the subpoenas. Section 34-1015 authorizes the defendant to promulgate rules and governs the dis-position of license money received by the defendant. Section 34-1016 states that no provision of the act shall prevent a cooperative organization "from blending the net proceeds of all of its sales into various classes and paying its producers such blended price  *  *  *." Section 34-1017 renders a violation of the act a mis-demeanor. Section 34-1018 authorizes the employment of hearing examiners and outlines the procedure which governs such hearings.

Section 34-1009, of which we omitted a summary, declares that the defendant

"may classify licenses and may issue licenses to dealers to  *  *  *  manufacture or sell milk limited to  *  *  *  a particular market or markets within the state, and may define what shall constitute a natural market area  *  *  *. A market area shall include no more than one city or town, together with the contiguous territory within a reasonable dis-tance immediately around the same, where market-ing conditions are the same, unless two or more towns or cities are so closely adjacent to one another that they comprise but one natural market area and are subject to the same marketing conditions, in which event, such two or more adjacent towns or cities together with the contiguous area around the

same as heretofore defined, may be included in one marketing area. Each market area, * * * shall include only that territory in which conditions involved in the production, processing and distribution of milk are similar. * * *''

The above is a synopsis of the statutory provisions which govern the issues before us. The defendant-respondent's brief says: ''The respondent does not rely on any implied or inherent powers of the Milk Control statute to sustain the judgment of the lower court.'' Hence, this case is free from claims of implied and inherent powers.

The defendant contends that amended § 34-1003, subd. (c) and § 34-1009 authorized him to deny the plaintiff's application for a license. In addition to considering those sections of our laws, we shall also take note of amended § 34-1003, subd. (g) and § 34-1015.

■ It will be recalled that amended § 34-1003, subd. (c) authorizes the defendant ''to supervise and regulate the milk industry''; that amended § 34-1003, subd. (g) empowers the defendant to adopt and enforce needed rules and regulations; that § 34-1009 enables the defendant to (1) classify licenses, (2) prescribe the territorial limits of milk marketing areas and milk production areas, and (3) limit the territory within which a licensee may operate; and that § 34-1015, like § 34-1003, subd. (g), empowers the defendant to make necessary rules and regulations. Availing himself of the powers conferred by § 34-1003, subd. (g) and § 34-1015, the defendant promulgated the rule which we have quoted, reading as follows:

> ''No milk dealer or distributor who is licensed for a specific market and sales area may lawfully purchase milk from producers not qualified for the market in which the said milk dealer or distributor

is licensed, nor may such distributor or milk dealer lawfully sell to any other person, distributor or milk dealer not licensed in said market any portion of said fluid milk and/or cream suitable for the bottle and can trade for resale without first obtaining the written consent of the Department of Agriculture, Milk Control Section.''

The rule just quoted possibly has its roots in § 34-1009, but the defendant's rulings that the delivery of a bottle of milk from the Lucerne plant to one of the plaintiff's stores constitutes a sale is, obviously, erroneous.

■ Before returning to § 34-1009 we shall pause for a moment upon § 34-1003, subd. (c). Its language is sweeping and authorizes the defendant ''to supervise and regulate the milk industry.'' If the seven words quoted must be given their literal import throughout the act, all of the rest of the latter, with the exception of §§ 34-1002, 34-1008, 34-1014 and 34-1017, could have been left unpenned. In contrast to the general and indiscriminate provision just quoted, the act contains many sections which are specific and which clearly identify the course of action which the defendant is authorized to pursue in the instances to which they are germane. It is our duty to construe and give effect to the act in its entirety. After reading the whole act, we must seek from all of its terms the purpose of the enactment, for the intention of the whole controls the meaning of the parts. *Sunshine Dairy v. Peterson,* supra.

The draftsman of a statute, unlike a painter or a sculptor, has no choice of materials, such as canvas, bronze or marble, with which to work in depicting the ideas which he wishes to portray. Bronze, marble, paint and clay respond to the artist's touch and subject them-

selves to his control. But there is available to a drafts-
man of a statute only words—inflexible and yet
treacherous in their connotation. They do not forge
in the minds of all readers the same images.

██ In an effort to find the ideas which are pack-
aged in words, the courts have fashioned the rules of
statutory construction. Those rules always give pref-
erence to specific provisions over others which are
general or abstract. One of the rules holds that definite
provisions in a statute relating to the subject under
consideration control general provisions, in the absence
of language which requires a contrary holding. *Leet v.
Barr*, 104 Or 32, 202 P 414, 206 P 548. In the construc-
tion of legislation which confers authority upon offi-
cials, the rules render the courts ever sensible to the
axiom that ours is a government of laws and not of
men. See, generally, 12 Tulane Law Rev. 179. Another
of the rules is expressed by Sutherland, Statutory Con-
struction, 3d Ed, § 322, as follows:

> "The tendency of the more recent cases is to
> sustain delegations of the licensing power even when
> broad discretions are delegated. This tendency
> seems justifiable when activity of licensing is an
> appropriate field for legislative regulation and
> where the determination of conditions is impractic-
> able for legislative resolution and the legislature
> has provided as practical a standard for administra-
> tive guidance as is appropriate for the particular
> regulation."

In construing the very Act now before us, this court,
in *Sunshine Dairy v. Peterson*, 183 Or 305, 193 P2d
543, stated the rules of statutory construction of para-
mount importance to the issue awaiting decision. Those
rules, as stated in that decision, are:

> "This court has recognized certain special

guides to statutory construction which apply when the question to be determined is the extent of power which has been delegated to an administrative body. * * * In Board of Railroad Commissioners of the State of Oregon v. Oregon Railway and Navigation Company, 17 Or. 65, 19 P. 702, this court said:

" 'It has for a long time been considered the safer and better rule, in determining questions of jurisdiction of boards and officers exercising powers delegated to them by the legislature, to hold that their authority must affirmatively appear from the commission under which they claim to act.

" 'There is too strong a desire in the human heart to exercise authority, and too much of a disposition upon the part of those intrusted with it to extend it beyond the design for which, and the scope within which, it was intended it should be exercised, to leave the question of its extent to inference. Should it be so left, serious disturbances might arise, involving a conflict of jurisdiction which would be highly detrimental to the community.

" 'It is not, it seems to me, requiring too much of the legislative branch of the government to exact, when it creates a commission and clothes it with important functions, that it shall define and specify the authority given it so clearly that no doubt can reasonably arise in the mind of the public as to its extent.'

"In the more recent case of Layman v. State Unemployment Compensation Commission, 167 Or. 379, 117 P. (2d) 974, 136 A. L. R. 1468, the court said:

" 'It is an elementary and fundamental principle, which no one will dispute, that a commission, created by the legislature to administer a statute, is wholly limited in its powers and authority by the law of its creation. No more unwholesome doctrine could be suggested than that such a body is vested with discretion to ignore or transgress these limitations even to accomplish what it may deem to be laudable ends. That would be to leave room for

that "play and action of purely personal and arbitrary power" condemned in Yick Wo v. Hopkins, 118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220, 226. If the statutes as written is not workable, then the remedy is with the legislature.  *  *  *.'

*  *  *  *  *

"If, in a doubtful case, the court should expand the legislative delegation of power beyond the legislative intent, it would, to that extent usurp the function of a coordinate department and permit the immediate exercise of powers which are not for courts to bestow.  *  *  *."

That decision renders it clear that any official, such as the defendant, who claims that authority was delegated to him to enter the order under challenge must place his finger upon legislation couched in express and nonambiguous language. In fact, it must be worded in terms so clear "that no doubt can reasonably arise in the mind of the public."

The rules of which we have just taken notice suggest that we now determine whether the Milk Marketing Act contains specific provisions opposite to the application for a license which the plaintiff submitted to the defendant or whether the general language of § 34-1003, subd. (c), ["to supervise and regulate the milk industry"] is the only legislative direction which guides the defendant in determining the market areas which should be assigned to a licensee.

■ As we have seen, the Milk Marketing Act contains many provisions couched in specific language which apply to licensing. One of them demands that every milk dealer procure from the defendant a license; another prescribes the form of the license application and the information concerning himself, his equipment and his personnel which the applicant must enter upon

the form; the next lists categorically seven grounds which require the defendant to reject a license application or to suspend or revoke a license already granted; and still another requires the licensee to maintain records which reflect his daily transactions and expenses. The very fact that each of those provisions is cast in exact terms would render the situation anomalous if the legislature intended that other phases of licensing should be governed by a grant of power as lacking in definiteness as the provision "to supervise and regulate the milk industry."

Section 34-1009, in addition to authorizing the defendant to divide the state into market areas and production areas, empowers him to "issue licenses to dealers to * * * manufacture or sell milk limited to * * * a particular market or markets." The parties agree that the word "manufacture" as used in the section just quoted means to process.

From the words just quoted, we see that the defendant possesses authority to restrict a milk dealer to a single market or to authorize him to process for and sell milk in more than one. See, to the same effect, *State ex rel. Peterson v. Woodruff*, 179 Or 640, 647, 173 P2d 961. Unless the act expresses the rules which guide the defendant in determining whether a milk dealer should be awarded more than one market, that highly important function is entrusted to him without any direction whatever from the legislature as to what he should do with applications such as the one submitted by the plaintiff.

■ Neither party to this appeal claims that the defendant possesses, carte blanche, authority to reject or grant applications such as the one which the plaintiff submitted. As is seen from the findings which he

entered, the defendant believes that if a market area into which a newcomer wishes to enter as a processor is presently receiving adequate service, he is required to reject the application. We infer that the defendant surmises that the act contains a clause somewhat akin to a provision for a closed shop or one which requires the new applicant to obtain a certificate of public convenience and necessity. We have read the Act with care, but have been unable to find in it anything which requires the newcomer to indict the existing milk service before he can hope to succeed with his application for a license.

We think that sections of the act which we have reviewed, and to which we shall presently advert, render reasonably clear the circumstances under which the defendant may restrict a licensee to only one market, or enable him to conduct his business in more than one. The sections which we have in mind are, in part, those which contemplate that milk dealers (1) should be capable and responsible; (2) should have adequate personnel and equipment for the conduct of the business for which they seek a license; and (3) have not given indications of "inability or unwillingness properly to conduct the business of handling and selling milk." We also have in mind the sections which speak of "natural market areas" and "territory in which conditions involved in the production, processing and distribution of milk are similar." Still other provisions which we deem pertinent to the present inquiry require milk dealers to maintain adequate records which reflect their daily transactions and record in detail their costs of operation. The Act affords the defendant constant access to those records. The evidence in this case indicates that the defendant consults with

regularity the records of milk dealers, and also that he compiles from the information gleaned from their books data which is useful to him in his administration of the Act. In the manner just indicated, he has become apprised of such practical information as the volume of business conducted by milk dealers, the extent of their equipment and the expenses which they incur in all phases of their operations, such as processing and distributing. Testimony indicates that the data which the defendant has compiled includes such practical information as the cost per quart of processing and distributing. The data shows the margin between retail price and the milk dealer's total costs. From the foregoing, it is manifest that the defendant has intimate knowledge of the amount of equipment, the required capital and the number of employees which an applicant should have when he seeks to enter one or more markets. Likewise, the defendant is familiar with the various market areas and of the conditions in them with which a milk dealer must cope.

■ Obviously, the Milk Marketing Act requires the defendant to take into consideration, when he determines whether an application should be granted or rejected, all of the information of which we have taken notice. The purpose of § 34-1005 in demanding that an applicant for a license should divulge pertinent information about himself, and of §§ 34-1003 and 34-1010 in affording the defendant access to practical knowledge of the milk dealers' operations, is to enable him to rule advisedly upon applications for licenses. But we think that the Act with equal clarity requires the defendant to employ the same information and knowledge when he determines whether an applicant should be restricted to only one market or should be granted

the privilege of doing business in more than one. The Act, according to our construction of it, deems that licensing consists, not only of determining which applications should be granted and which rejected, but also the number of markets which should be assigned to a licensee. The two functions are parts of the same process. The data which governs the one phase of licensing is in large part applicable to the other.

10. It is our belief that the Act contemplates that the defendant, in determining whether an applicant should be restricted to a single market or should be authorized to do business in more than one, is required to consider all of the facts and circumstances of which we have taken notice. He should call to his avail the knowledge of the milk industry which he has gathered from his official experience and from the records of licensees. Thus, he should consider, for example, the applicant's responsibility, his financial worth, the extent of his equipment, the number of his personnel and his record as a milk dealer. Other sections of the act show that the defendant should also take into consideration whether or not "conditions involved in the production, processing and distribution of milk are similar" in the two or more market areas for which the applicant seeks a license. It seems clear that the Act does not intend that a milk dealer should be licensed for two markets if his processing plant or personnel is adequate for only one. If such an individual is granted a license authorizing him to do business in two markets, he will either render poor service or will neglect one of the markets. In the latter event, the defendant's records will show a larger number of licenses outstanding than those that are actually employed. In short, when the defendant determines whether an applicant should be

authorized to do business in more than one market, he is required to exercise sound and informed judgment based upon the entire record which lies before him. The question which he must answer after he has analyzed the record is this: Is this applicant equipped to render efficient and responsible service in the entire area which he seeks to serve? The defendant is not authorized, however, to deny a license merely because the applicant cannot indict the service which is already being rendered.

The above, we believe, is a just interpretation of the provisions of the Milk Marketing Act which govern the issues before us. It conforms, we believe, with the demands of § 2-216, OCLA, which says:

> "In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all."

The above construction does not detract from the power of the defendant to see to it that producers receive ample prices; nor does it affect his authority to secure, through adjustments in market areas, an ample supply of milk for all communities.

It is our belief that the defendant misconstrued the Act when he entered his findings. He was not, according to our understanding, authorized to deny the application merely because he found that the Salem market area was receiving adequate service and that a grant of the plaintiff's application would have an adverse effect upon present licensees, that is, the interveners.

The defendant relies upon *State ex rel. Peterson v. Martin,* supra, as support for his contentions that the defendant can deny a license to an applicant-processor if he believes that the community in question is receiving adequate milk service. That decision contains language which lends support to the defendant's claim, but we believe that it will not be amiss to take note of the issues which were submitted when that case was appealed, for it is not every judicial utterance which becomes stare decisis. The complaint in the case was filed by the director of the Milk Marketing Act and averred two causes of suit. The prayer sought an injunction restraining the defendant, Martin, from rendering milk service in the city of Sheridan. Martin was a producer-distributor. The first cause of suit alleged that Martin was selling milk in the city of Sheridan "without having a license to offer or sell said fluid milk suitable for human consumption within the said City of Sheridan." It alleged that his course of conduct was long continued and constituted a public nuisance. The second cause of suit alleged that (1) at a time when Martin had a license authorizing him to sell milk in the city of Willamina, he applied for a license authorizing him to sell milk also in Sheridan; (2) later, the milk director held a hearing upon Martin's application; (3) at the close of the hearing, the director entered an order denying a license for Sheridan; (4) notwithstanding the order denying a license for Sheridan, Martin continued to sell milk in that city; (5) after the denial of the application, Martin challenged, by a proceeding for a writ of review, the validity of the director's order; (6) upon a hearing in the circuit court the writ was quashed and the director's order was affirmed; and (7) Martin's continued course of conduct in selling milk in Sheridan without a

license constituted the maintenance of a nuisance. The answer, after some admissions and denials, averred that on December 31, 1945, the milk administrator granted Martin "a license to operate as a milk dealer and distributor within the district of Willamina and Sheridan, Oregon, which comprises the same district referred to in plaintiff's complaint * * *; that said license is still in full force and effect." The reply alleged that the license mentioned in the answer was mailed to Martin through mistake by an employee in the director's office who had no authority to issue such a license. The reply further alleged that within two or three days after the mailing had occurred, the mistake was discovered and the director advised Martin by long distance telephone of the mistake. It further alleged that on the same day the director sent to Martin, by registered mail, a license for Willamina only. Upon the trial, the circuit court sustained the averments concerning mistake and entered a decree which granted the requested injunction. Martin appealed. His appeal submitted two assignments of error. The first was:

"The court erred in holding that the defendant A. L. Martin did not have a valid license to distribute milk in the City of Sheridan."

Accompanying the first assignment of error were the following propositions of law:

"After a distributor's license has been granted by the Department of Agriculture, the only method for cancellation is that provided by Section 34-1006, O.C.L.A."

"Upon an application for a distributor's license, the Department of Agriculture has no discretion to refuse such a license and must allow the same unless it appears that the distributor applicant has

been guilty of any of the acts set forth in Section 34-1006, O.C.L.A.''

"The license issued to A. L. Martin to distribute milk in the Sheridan district has never been cancelled by order of the Department of Agriculture.''

The second assignment of error was:

"The court erred in granting an injunction prohibiting the appellant from distributing fluid milk within the City of Sheridan, Oregon.''

It will be seen from the nature of Martin's assignments of error and propositions of law that he was forced to concede that he conducted his business in Sheridan without a license, unless revocation proceedings were essential to the termination of the erroneously issued license. His second proposition of law that the defendant had no lawful right to deny him a license could avail him nothing because (1) the fact remained that he had no license; and (2) the circuit court, upon review of the license denial by a proceeding instituted by Martin for a writ of review, had quashed the writ and affirmed the order of license denial. Martin had not appealed from the court's order. Accordingly, the issues submitted by the Martin appeal, apart from the purported issue of license revocation, were these: Did the circuit court err when it held that the Sheridan license was issued to Martin by mistake; and could the administrator rightfully correct his mistake. After this court had affirmed the circuit court's holding in favor of the director upon the issue of mistake, there was no occasion to go further.

American Jurisprudence, Courts, Vol. 14, § 82, p. 295, in the following language, states a well-known principle of law:

"The doctrine of stare decisis contemplates only

such points as are actually involved and determined in a case, and not what is said by the court or judge outside the record or on points not necessarily involved therein. Such expressions, being obiter dicta, do not become precedents."

A recent example of the application of that rule to a decision by this court is *McCredie v. Commercial Casualty Insurance Co.*, 142 Or 229, 20 P2d 232. We think that the utterances in the Martin decision which lend countenance to the defendant's contention were not within the doctrine of stare decisis. But even holdings that are within the doctrine of stare decisis are not beyond subsequent re-examination. If they were, the growth that the common law has made in the last six hundred years, and which has kept it abreast with Anglo-Saxon progress, would not have been made. The following is quoted from 21 CJS, Courts, § 193, p. 322:

"The rule of stare decisis is not so imperative or inflexible as to preclude a departure therefrom in any case, but its application must be determined in each case by the discretion of the court, and previous decisions should not be followed to the extent that error may be perpetuated and grievous wrong be the result. Accordingly, unless a doctrine or principle has become so well established that it may fairly be considered to have become a rule of property, * * * the courts will not adhere to it, although established by previous decisions, if they are convinced that it is erroneous, even though it may have been reasserted and acquiesced in for a number of years, especially if the former decisions are injurious or unjust in their operation."

*State v. Mellenberger*, 163 Or 233, 95 P2d 709, 128 ALR 1506, a criminal case, in departing from a precedent, quoted the following from Dr. Roscoe Pound:

"In the epigrammatic phrase of Mr. Justice Holmes, historical continuity is not a duty, it is

only a necessity. It is not that we ought to .hew to what our forbears have done in the past as a matter of duty. But we find ourselves starting where they left off, building upon what they did and using the materials they left to us. In law we have to perceive how and why legal institutions arose, and to what ends, and with newer and better perceived and better understood ends, to adapt the institutions and materials which have come down to us to the tasks of social control in the time and place. Our materials are experience by reason and testing reason by experience. 'Every generation,' says Sir Frederick Pollock, 'takes up from its fathers, if it is worthy of them, a new starting point of imagination and aptitude, and the strange conservatism of the imaginative faculty is a sure warrant of continuity.' ''

After that quotation, the Mellenberger decision took the following from an essay by Daniel H. Chamberlain:

''A deliberate or solemn decision of a court or judge, made after argument on a question of law fairly arising in a case, and necessary to its determination, is an authority, or binding precedent, in the same court or in other courts of equal or lower rank, in subsequent cases, where 'the very point' is again in controversy; but the degree of authority belonging to such a precedent depends, of necessity, on its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law, and the compulsion or exigency of the doctrine is, in the last analysis, moral and intellectual, rather than arbitrary or inflexible.''

We adhere to our belief that the Martin decision is not within the doctrine of stare decisis. Clearly, it is subject to re-examination.

A specially concurring opinion written by Mr. Justice WARNER analyzes the part of the Martin decision which construed the Milk Marketing Act. In

view of that analysis, which this decision by reference incorporates into itself, nothing more need be said. We deem the part of the Martin decision upon which the defendant relies as not within the protection of stare decisis and, for the reasons expressed by Mr. Justice WARNER, unsound. Statements in *State ex rel. Peterson v. Martin,* supra, contrary to our holding in this case must be deemed withdrawn.

A careful analysis of the Milk Marketing Act by us has found nothing which supports the defendant's claim to economic control over processors.

Since the defendant has issued licenses to the plaintiff which authorize it to operate both as a dealer and as a processor, he evidently is satisfied with its responsibility and equipment.

The cause is remanded to the circuit court so that it may instruct the defendant to issue the necessary license.

WARNER, J., specially concurring.

The gist of the minority's position is brought into sharp focus by the following question propounded by Mr. Justice BRAND in his dissenting opinion, concurred in by Mr. Justice LUSK, and where it is asked: "Can it be said that the defendant [director] can insure a reasonable return to the milk dealer if it is powerless to control the number of dealers who operate processing plants in a given market area?  *  *  *"

As I view the matter, the query so advanced by the minority presents the prime problem we are called upon to resolve in the instant appeal.

Having in mind the operating status of the applicant plaintiff, the question as presented assumes that the applicant dealer will utilize milk produced in the same production area from whence the market area

customarily secures its quota of fluid milk for processing and distribution. In short, if plaintiff is licensed, there will be no disturbance in the pre-existing quotas of milk produced, processed or distributed by the applicant licensee in the market area in which he seeks to operate. Plaintiff merely offers to sell its ''services'', as the word is hereinafter employed.

It is upon the minority's question that I center my attention. In its correct answer, I submit, we will find justification for the conclusion of the majority.

It should be immediately apparent that the question is a challenge to the powers of the defendant director to stabilize the production and distribution of milk in a given area by the exercise of economic controls which have for their purpose the stifling of competition between dealers in that area, a concept which is tantamount to the creation of monopoly when applied.

It must also be evident to those who critically scan the opinions of the majority and minority that the fundamental point of separation centers around their respective interpretations of one of our relatively-recent decisions. The precedent which serves to divide us instead of pointing the way for united thought is *State ex rel. Peterson v. Martin,* 180 Or 459, 176 P2d 636, decided in 1947, with one judge dissenting. I shall hereinafter refer to it as the Martin case.

The clarity of the Martin holding is unfortunately obscured by certain irrelevant citations that account for much of the attendant confusion which contributes to the court's present division. The thought of the majority concerning the Martin case is epitomized in the following statement:

> ''It is our belief that the defendant misconstrued the act when he entered his findings. He was not, according to our understanding, authorized to deny

the application merely because he found that the Salem market area was receiving adequate service and that a grant of the plaintiff's application would have an adverse effect upon present licensees— that is, the interveners. * * * Statements in State ex rel. Peterson v. Martin, supra, contrary to our holding in this case must be deemed withdrawn."

With this statement I find myself in complete accord.

The nub of the minority thinking with reference to the Martin case finds expression in the dissent in these words: "* * * The decision [of the majority] is directly opposed to the decision in *Peterson v. Martin,* supra. * * *" Although not addressed specifically to the Martin case, the minority summarize their objections in these words:

"* * * If this court deprives the defendant of power to consider the economic effect of its action in granting or withholding processors' licenses, the door will be opened for unrestricted competition at the very heart of the milk industry, with the result that the exercise of the other powers vested in the defendant and confirmed by this court will be ineffective for the accomplishment of the legislative purpose."

To these conclusions of the minority I cannot subscribe.

Further evidence of the confusion and misunderstanding of the rule laid down in the Martin case is found in the divergent construction given to it by the parties to this appeal. The defendant claims it embodies the "precise question" presented in the instant matter. In my opinion, the plaintiff applicant more nearly and correctly captured the distinctions between the Martin case and the instant case which result in leaving the Martin case unimpaired as authority for the matter there ruled upon and of no value as determinative of the issues raised by the facts in this appeal.

To these distinguishing features I will make later reference.

Before referring again and more particularly to the Martin case, I feel it is appropriate to make some general observations. There is a sharp difference between the power to control and stabilize the distribution of the milk supply between producer and consumer and the power to insure adequate service. As I use "distribution" in the foregoing statement and hereafter employ it, I refer to the supply of milk in a given production area and the sufficiency thereof to meet the consumer demand in a given market area. When I refer to "service", I have in mind the mechanical agencies employed by the middlemen, i. e., the plants and facilities of the dealers or manufacturers who process the milk when received from the producers and the plants and physical devices employed by the distributors to thereafter further the delivery of the processed milk to the ultimate consumers. All must be licensed by the director. These definitions of "distribution" and "service" are so clearly warranted by a reading of the milk control act that no citation is necessary. Moreover, they must be kept clearly in mind if one is to understand better the basic cleavage in construction accorded by the respective opinions of the minority and majority in this matter.

It is my thesis that if we extend the true meaning and intent of the Martin case to give it character as authority for the proposition that the defendant is vested with the power to deny licenses on the grounds that there are already adequate facilities for service in a given market area and that the presence of one or more additional processors or dealers in that area might endanger the monetary return for those already there, we will thereby give adherence to an economic

doctrine not contemplated by the legislature as either necessary or efficacious to accomplish the ends sought to be achieved by the milk control act. That doctrine could only and inevitably lead to the creation of monopoly, a species of economic practice abhorrent to the organic law of this state (Or Const, Art I, § 20).

It is true, as said in *Savage v. Martin,* 161 Or 660, 676, 681, 91 P2d 273, that "The evils which the Oregon Milk Control Law are intended to correct are chiefly economic ones" and that it was "enacted primarily to promote the public interest by relieving those in the milk industry from hazards to which it is exposed in an uncontrolled market." However, these generalizations of legislative purpose cannot, with the exercise of judicial propriety, be construed to confer carte blanche authority upon the director to employ any and every economic device which the defendant might arbitrarily choose to attain the purpose and circumvent the evils referred to in *Savage v. Martin,* supra, even if in so doing he might safely terminate all hazards incident to an uncontrolled market. At least, he should not be invested with the power to do so unless it is clearly found within the periphery of the milk control act. I find nothing in the act which either expressly or by inference warrants a conclusion that legitimate competition among any number of dealers was intended to be suppressed or discouraged, nor is such an end essential to obtain the over-all purpose for which the act was designed. By legitimate competition I mean conduct on the part of the dealers which would not in and of itself work a revocation of a license for any of the reasons set out in § 34-1006, OCLA.

It should also be observed that anything said in *Savage v. Martin,* supra, cannot be appropriately or effectively invoked as support for the minority's opin-

ion in the instant appeal, for therein it is said, at page 679: "It should also be remembered that we are not concerned with a case involving the licensing provisions of the law and the right of a person to engage in the milk industry. * * *" Here we are confronted with the precise question which the court declined to pass upon in the Savage case.

Speaking broadly, the over-all formula laid down by the legislature in the milk control act, as its chosen vehicle for combatting the then-prevailing evils of maldistribution of milk and demolition of price structure, provided for the equalization of distribution of the milk supply by the creation of fixed production and marketing areas, with boundaries natural to the areas served. These boundaries rightly become barriers against the flow of milk into them from other districts. The legislature also provided for the establishment of minimum prices to be paid by the processor to the producer, the dealer to the processor and the consumer to the dealer. Thus was provision made to insure a constant market for the dairyman and a constant milk supply for the public, coupled with a reasonable return for all, immutable as to the hazards of maldistribution of supply and the fluctuating prices which had previously prevailed. That these two over-all controls were sufficient to accomplish the intended legislative result is attested by the generally-recognized stability which has prevailed in the milk industry since the law's first enactment 20 years ago. The destructive and disruptive practices which then existed have, in the main, been mastered and all done to date without the necessity of specifically reposing in any official, as was done in New York, an express power to deny the issuance of a license to a processor or dealer if "the issuance of the license will not tend to a destruc-

tive competition in a market already adequately served."

In my opinion, there is no occasion to overrule the Martin case but rather clarify the holding in terms of the facts there existent and limit it as authority to its true and what I think was its intended meaning, that is, that the director has authority to deny a dealer's license to conduct business in a given market area when, in so doing, the dealer will increase the supply of milk limited to that area for distribution, and, in all probability, in so doing cause a pro tanto diminution in the amount necessary to supply some other market area. What the director in fact did in that case was to prevent a maldistribution of the milk supply. It was not predicated upon what might be said to have been an economic impact adverse to any other dealers already serving the Sheridan market. In so doing, he was enforcing one of the prime objectives of the act and was authorized by § 34-1009, OCLA.

The Martin case is, therefore, not in conflict with the majority holding in this matter. It adds nothing thereto nor does it subtract anything therefrom. As warrant for these conclusions, I quote from the Martin case (180 Or 473):

"* * * As the administrator had determined that the Sheridan market was already adequately served, and that the granting of a license to an additional distributor to sell milk therein would be economically wasteful, not in the public interest, and harmful to a stabilized production and distribution of fluid milk and cream for human consumption, we are of the opinion that the refusal of the administrator to permit Mr. Martin to enter the Sheridan market area was a reasonable exercise of a valid discretionary power vested in the administrator by the Act. * * *"

It may also be appropriately observed that Martin had theretofore been licensed to distribute milk in the Willamina market; and it is, therefore, a fair assumption that the maldistribution of the milk produced by him in increasing the Sheridan supply would have been reflected by depletion correspondingly in the amount of milk necessary to meet adequately the needs of the Willamina market.

The court in the Martin case could have rested its holding upon the provisions of § 34-1009, OCLA, but, unfortunately, encumbered that opinion with irrelevant citations bespeaking broader economic powers than there claimed by the director. The clarity of the holding was further clouded by other references which have had the effect of obscuring the true holding of that case and impairing it as clear-cut authority. The majority opinion very appropriately notes: "* * * That decision contains language which lends support to the defendant's claim * * *." I will now refer to some examples productive of the confusion in thought which have followed in the wake of that case.

The court in the Martin case apparently leaned heavily, but unnecessarily, upon two New York decisions construing the milk control act of that state. They are *Matter of Dusinberre v. Noyes,* 284 NY 304, 31 NE2d 34 (decided December 3, 1940) and *Application of Dellwood Dairy Co.,* 263 App Div 923, 32 NYS2d 411 (decided January 21, 1942). The latter case of the lower court, although citing no authority, follows the tenor of and is in accord with the Dusinberre decision. It, therefore, adds nothing by way of analysis to the holding made by the highest court of appeal in that state, and for the same reason adds nothing to the force of our holding in the Martin case.

It is merely repetitive of the rule earlier expressed in the Dusinberre case.

From the quoted portion of *Matter of Dusinberre v. Noyes,* supra, found in the Martin case at page 470, it will also be observed that the New York decision holds that the commissioner (in Oregon, the director) is expressly invested by § 258c of the milk law of that state (ch 126, Laws of New York, 1934) with statutory power, among other things, to issue the license if *"the issuance of the license will not tend to a destructive competition in a market already adequately served".* (Italics mine.) Section 258c of the New York milk law relates to the refusal, suspension or revocation of licenses and in function corresponds to § 34-1006 of the Oregon milk control act; but, as the court expressly said in the Martin case, no violations of § 34-1006 were involved in that case.

The approval which we apparently and so needlessly gave to the New York cases above referred to now comes back to confound us. Witness the defendant now resting on this ostensible sanction in the Martin case by his citation of the New York cases here as authority for his premise for the economic powers of the defendant contended for in this matter and evidently in support of his proposition that the Martin case involved the "precise question" presented by this appeal.

A further matter leading to the confusion stemming from the Martin case is found in its apparent and inappropriate reliance upon certain language of the preamble to the Oregon milk control act, which is there interpreted by the court to "include the establishment and maintenance of reasonable returns to producers and distributors, as well as the fixing of a reasonable price to be paid by the consumers". (180 Or 468) This is the only deduction made by the court in that case

concerning the legislative intent as drawn from the preamble. In essence, it is tantamount to saying that the director has power to fix prices, and that no one will venture to gainsay, for the only returns received by either producers or distributors are money returns made in accordance with prices previously established by the director. However, recourse to the preamble is not necessary to discover that self-evident truth, when it is reflected with great particularity in the milk code by § 34-1012, OCLA. It, therefore, follows that this observation in the opinion concerning the power of the director to establish and maintain ''reasonable returns to producers and distributors'' becomes an innocuous and valueless observation as a support to the court's over-all conclusion that the director is empowered to refuse to issue a dealer's license, if by so doing it will tend to disturb the milk distribution in a given market already adequately supplied, unless we further assume that the director, without the suggestion of any restraint or standard found within the four corners of the statute, also can, in the maintenance of reasonable returns, arbitrarily adopt any economic theory of his choosing, including the stifling of competition to accomplish that result.

No one can quarrel with the legislative declaration of the important purpose of the milk control act found in the preamble thereto (ch 72, Oregon Laws, 2d SS, 1933). However, there is a vast difference between the ''broad aspects'' of the milk problem, as set forth therein, and the mechanics for achieving a solution to the problems reflected by the recitals found in a preamble to an act. In 50 Am Jur, Statutes, 131, § 152, it is said:

> ''A preamble to a statute is an introductory or prefatory clause, following the title and preceding

the enacting clause, explanatory of the reasons for its enactment and the objects sought to be accomplished. It is usually introduced by the word 'whereas,' meaning 'considering that' or 'that being the case.' It is not an essential or effective part of an act, the purview of which consists of all parts thereof after the preamble. The preamble cannot enlarge or confer powers, or cure inherent defects in the statute. There has been a gradual abandonment of the use of a preamble in statutes, but where it is inserted, it is not regarded as invalidating the law."

"* * * it is not an essential part of the act and neither enlarges nor confers powers * * *." *Portland Van & Storage Co. v. Hoss,* 139 Or 434, 445, 9 P2d 122, 81 ALR 1136. In doubtful cases, however, it may be considered in the process of construction. *Sunshine Dairy v. Peterson et al.,* 183 Or 305, 317, 193 P2d 543. Recourse to the preamble in the Martin case, or even in the instant case, relating as they do to questions of the extent of the director's powers of economic control, is not only unnecessary but becomes a self-defeating enterprise. The last "whereas" reads (ch 72, Oregon Laws, 2d SS, 1933):

"Whereas in order to protect the well-being of the people of the state of Oregon and promote the public welfare, the production, transportation, manufacture, storage, distribution and sale of milk and cream in the state hereby is declared a business affecting the public health and interest *which should be supervised and controlled in the manner hereinafter provided* * * *." (Italics mine.)

The italicized words render it tantamount to saying: Look not here but to the body of the act itself, if one is to discover how far he can or cannot go in accomplishing the several ends sought to be attained by the recitals in this part of the preamble. Indeed,

in *Sunshine Dairy v. Peterson et al.,* supra, at page 320, we referred to these very words with the following observation: "The declaration in the preamble that the distribution and sale of milk should be 'supervised and controlled in the manner hereinafter provided' is no more indicative of the power of price fixing than the provision of section 34-1003. * * *" So, also, can it be said concerning § 34-1009, OCLA, in its relation to the powers of the director involving the issuance of licenses and the creation of market and production areas. Had the court in the Martin case observed and applied the rules of construction so cogently and pertinently applied in *Sunshine Dairy v. Peterson et al.,* supra, I doubt if we would now be confronted with the division of opinion reflected by this appeal.

When we thus excise from the Martin case the irrelevant references found therein relating to the New York cases which it cites and those pertaining to the preamble, the true character of that holding becomes more readily apparent and renders it valueless as a support for defendant in the instant matter.

Inasmuch as my view concerning the Martin case is one of interpretation which does not require overruling that holding, there is no necessity for me to discuss the matters raised by the separate dissenting opinion of Mr. Justice LUSK.

Section 34-1012, OCLA, as amended by ch 397, Oregon Laws 1951, is the basis of the board's authority to fix minimum prices and, insofar as pertinent, directs that

"The board shall ascertain what prices for milk in each locality and market area of the state will best protect the milk industry and insure a sufficient quantity of pure and wholesome milk in the public interest. The board shall take into

consideration all conditions affecting the milk industry, including the price necessary to produce a reasonable return to the producer and to the milk dealer. In determining the minimum prices for each class in any market area, the board shall take into consideration the reasonable unit cost of each class of handling milk incurred by each such class mentioned * * *."

Predicated upon this statute, the minority opinion poses the question earlier quoted: "Can it be said that the defendant can insure a reasonable return to the milk dealer if it is powerless to control the number of dealers who operate processing plants in a given market area? * * *" The foregoing question clearly reveals the trend of the minority thinking, and its weakness is immediately exposed from the use of the phrase *"insure a reasonable return* to the milk dealer". (Italics mine.) Those are precise words conveying a positive and significant meaning; and when employed by the scholarly author of the dissenting opinion, those words are not carelessly used and may be accepted as intending to give an exact definition of his theory of the scope of the administrative powers conferred by the milk control act. However, there is nothing in § 34-1012, nor, indeed, elsewhere in the act, which obligates the director to *insure a reasonable return* to any person or class of persons engaging in the milk industry. That section does not throw its cloak of protection around the individual dealer as might be implied from the question propounded. The "reasonable return" therein referred to is a reasonable return for all milk producers or dealers of a class operating within the areas affected by the minimum prices established by the determination of the board. The minimum price scale is not one of insurance or guarantee of reasonable, or even profit-

able, return to the various licensed individuals or groups of persons operating in the area but is rather one of assurance against price cutting on the part of any of their competitors. A reasonable return, predicated upon a minimum average or representative price within a class, does not necessarily mean in a fiscal sense that every member of that class will be insured of a profit from dealing at minimum prices so established.

Those who cannot make a profit from such "reasonable return" must necessarily give way to those who can. The act was not designed to insure or guarantee the continuing of a profitable operation for every producer or processor who elects to invest capital in the milk industry. The legislative concern is for the industry as a whole and particularly comprehends the welfare of the consumer public. This end is, in the main, achieved and the economic hazards of the industry minimized by the two major powers which the act confers on the director and the board, i.e., the power to fix prices and the power to determine market areas of production and distribution, fortified with the power to license and penalize those who deviate from the price fixed or who traffic in districts beyond the areas so established.

The authority to "control", enforced with the right to limit competition in a given area, connotes such a vast power, endowed as it is with the potentialities of destruction, that its exercise must necessarily be limited and constrained by standards found within the act sufficiently adequate to guide the person employing such a power and in his determination of the propriety of exercising it. More certainly is this true if its objective is to be construed as to guarantee or in-

sure a monetary return for any person or group of persons. The fact that we found standards for the guidance of the administrator in the Martin case (180 Or 473), in the action which he took therein, is not authority for concluding that such standards obtain for his direction in the exercise of the far-greater power to stifle competition in order to insure returns for dealers operating in a given market area. See the recent case of *Demers v. Peterson,* 56 Or Adv Sh 307, decided March 4, 1953, where we pointedly and emphatically spoke on this subject as follows:

"It is well established that the legislature cannot grant an administrative agency the power to regulate unless some standard or yardstick is provided in the act as a guide to the administrative agency; in other words, the authority to regulate may not be left wholly to the whim and caprice of such agency. Multnomah County v. Luihn et al., 180 Or 528, 542, 178 P2d 159; City of Portland v. Welch, 154 Or 286, 303, 59 P2d 228, 106 ALR 1188; Van Winkle v. Fred Meyer, Inc., 151 Or 455, 466, 49 P2d 1140."

I search the milk control law in vain for any standards whereby the director can measure the limits of the exercise of such power as the minority would invest in him.

If we concede the soundness of the minority's argument as reflected by their opinions, then we become parties to conferring a monopolistic advantage upon each already-licensed dealer. If the defendant is empowered to "insure a reasonable return" to each dealer by excluding the competition which would flow from the presence of newly-licensed dealers in the same area, then logic dictates that each previously-licensed dealer in the area should be subjected to a further control

establishing a status in quo for all of them, lest any one of them might, by the enlargement or modernization of his previously-licensed operation, attain thereby a competitive advantage which would result in denying his fellow dealers in the same area the reasonable return which, the minority says, the milk control act is designed to insure to them. Such a course of reasoning is not only creative of monopoly but could stifle competition within a given market area to a point where producers and consumers could suffer from the want of modern or adequate facilities for the processing and distribution of the milk reserved to that area.

The evils flowing from the doctrine of insured reasonable return are so infinite and so readily discernible that no further statement by way of illustration is necessary to support condemnation of a rule which would give them countenance.

The doctrine of a controlled economy, which is the essence of what the minority here contend for, to be effective must be complete. To be successful it must comprehend and be addressed to a numerical control of every group and every class thereof engaged in some phase of the milk industry from producer to consumer. Applying the economic theory patent in the question of the minority, it is evident that an overplus of producers in a given area can work the same hazard to the stabilization of milk distribution in a production area which, the minority contend, may result from an overplus of processors in a given market area. It would be vain, indeed, for the director to hope to stabilize distribution or insure a reasonable return to the producer, as well as the dealer, by addressing himself solely to a numerical control of those engaged in the business of processing the producers' milk supply. Cer-

tainly, the minority would not venture to subscribe to a doctrine of control of such revolutionary extreme and of such far-reaching consequence. If they do, I submit that they cannot find anything in the act which expressly or inferentially gives support to such reasoning. The very absence of statutory language conferring such power upon the director eloquently bespeaks the want of a legislative intent to stabilize milk distribution by a numerical control of the parties engaged therein, solely upon the premise that their presence might impair the status quo of previously-licensed dealers or of those previously engaged in milk production or, indeed, by way of insuring a reasonable return to any or all of them.

"Surely," say those dissenting, "the majority does not now intend to strike down *the entire* Act by judicial fiat. * * *" (Italics mine.) No doubt, this bit of exaggerated emphasis is inadvertent, but the concern manifested thereby suggests that unless we can give an emphatic negative answer to the minority's economic question hereinbefore quoted and discussed, all values conferred by the act will be lost. It is an unreasonable conclusion conveying a thought not warranted by the facts in this case nor by the long history of the act's successful administration without the powers the minority would add, nor by any reasonable forecast of what the future administration will be as a result of the majority opinion. However, if the "entire Act" is stricken by the character of "judicial fiat" which the minority pretend to find in the majority opinion, then how much better such a result than to open the economic Pandora box tendered by the minority, containing as it does new evils which will spring thence if we subscribe to a rule which insures

a reasonable return to every dealer by restricting the number of his competitors in any given area.

It is not for this court to write the economic policy for this state. That is a legislative function. It is not for us to suffer our personal views on the relative value of divergent economic policies or theories to tincture our judicial expression. However, it is equally axiomatic that we are under obligation to cleave tenaciously to the apparent legislative intent and not allow it to be subverted by judicially countenancing the expansion of the powers of administrative officials to a point where such officials can, under the guise of discretion and without adequate standards of control, substitute their will, their theories or their standards in lieu of, and possibly contrary to, the evident legislative design.

For the reasons hereinabove assigned, I concur in the opinion of the majority.

LATOURETTE, C. J., specially concurring.

I concur in the majority opinion written by Mr. Justice ROSSMAN, as well as in the specially concurring opinion of Mr. Justice WARNER.

The preamble to the milk control bill, ch. 72, Oregon Laws, Second Special Session, 1933, follows:

"Whereas the production and distribution of milk and cream is a paramount industry upon which to a substantial degree the prosperity and health of the people of the state of Oregon depend; and the present economic emergency is in a large part the result of the disparity between the prices of milk and cream and other commodities, which disparity has diminished the power of milk producers to purchase industrial products, has broken down the orderly production and marketing of milk and cream and has seriously impaired the agricultural

assets supporting the credit structure of the state and the local political subdivision thereof; and

"Whereas unhealthful, unfair, unjust, destructive and demoralizing economic trade practices have grown up and are now carried on in the production, sale and distribution of milk and cream and milk and cream products in the state which impair the dairy industry in the state and the constant supply of pure wholesome milk to the inhabitants thereof, and constitute a menace to the health and welfare of the inhabitants of the state   *   *   *."..

It is evident from the above that the act was directed to the alleviation of the economic distress of milk producers occasioned by the then depression and to insure a constant supply of pure wholesome milk to consumers and was not for the benefit of processors, such as the order of the Director in the present case appears to be directed. (In passing I call attention to the fact that the depression of the '30s has long since passed.)

The record in this case discloses that the plaintiff purchases its milk from the processors already operating in the Salem area who buy from the producers, and then sells it to consumers. The plaintiff requests permission from the Director to purchase milk directly from the producers in the Salem area instead of from the processors, process it in its plant in Portland, and return it to Salem for distribution to consumers. It is obvious that by such a procedure the producer would not be affected one way or another since the volume of milk sold by him would not be diminished.

The processors in the Salem area are now distributing to the consumer 3.5 per cent butterfat milk. Plaintiff, if given a distributor's license in such area, will manufacture 3.8 per cent butterfat milk and sell it to the consumer in cartons at its stores at a price

of one cent less than that now paid by consumers to the process distributors. It is again clear that the consumers will not be adversely affected by such procedure, but will be benefitted two-fold in increased butter and at a lower price. In other words, plaintiff's proposal is not detrimental to either the producer or the consumer. If the license were granted to plaintiff, this would be one of the rare instances in which the consumer, often the forgotten man, would be given a break; however, the Director, without any substantial reason disclosed by the record, has denied plaintiff a license, thereby creating a monopoly in the present Salem processors, two of which control the bulk of the trade. This, in my humble opinion, strikes at the very root of the free enterprise system which the American people have enjoyed since the founding of our government.

It is interesting to note that the "Independent Producers", a group from which plaintiff would purchase milk in this area, if permitted, appeared at the hearing and joined sides with plaintiff in the controversy, and, I believe, for a good reason. It is well known that the supply of butterfat greatly exceeds the demand; consequently, the government, in order to support the butterfat market, has purchased millions of pounds of butter now reposing in government warehouses, creating a problem as to its disposal. If turned back into the trade or to the public, this, indeed, would affect the producers injuriously, tending to beat down the price of the butterfat. If destroyed, it would create an economic waste. This butterfat glut on the market is occasioned in part by the fact that the processors who manufacture 3.5 per cent butterfat content for milk, instead of 3.8 per cent, sell the excess butterfat to the creameries, which, in turn, sell it to the govern-

ment. Would it not, therefore, promote the general welfare of the inhabitants and relieve the overstocked butter market, inuring to the benefit of the farmers producing milk, if plaintiff were permitted to pass on to the public the increased butter content of milk.

It is apparent to me that the order of the Director is arbitrary, unreasonable, is neither within the spirit nor the terms of the act, nor is it founded on facts sufficient to sustain such order.

BRAND, J., dissenting.

This is an appeal from the judgment of the circuit court quashing a writ of review. The appeal is taken to this court "in like manner and with like effect as from a judgment of such circuit court in an action." OCLA, § 11-210. There is no bill of exceptions and none was required in order to present the limited issues which were raised by the writ of review.

The first question is, of course, whether the defendant has been vested by the statute with jurisdiction to act upon plaintiff's application, either to grant or deny it. The majority opinion is based on the assumption that such jurisdiction was vested by statute in the defendant. Otherwise there would be no occasion for any discussion of the findings of the administrative body or of the evidence. Nor would it be necessary to enter into any consideration concerning the permissible scope of the inquiry which may be made in determining whether or not a license should be granted. While I have had some doubt as to the aforesaid jurisdictional question, I accept the majority view on that point. The jurisdictional question may be phrased thus; did the defendant have jurisdiction to entertain plaintiff's application for leave to purchase

milk from producers holding a quota upon the Salem market, process that milk in its licensed Portland plant and sell it in its licensed Salem stores? The answer, while not free from doubt, is in the affirmative.

The further inquiry is limited by the scope of procedure by writ of review. The writ does not lie to correct mere errors in the exercise of jurisdiction or to inquire whether the rulings of the defendant upon the law and the evidence and in the application of the law to the evidence are correct. *School District No. 68 v. Hoskins et al.*, 194 Or 301, 314, 240 P2d 949; *Bechtold et al. v. Wilson et al.*, 182 Or 360, 186 P2d 525, 187 P2d 675. Jurisdiction to act being assumed, the only question remaining before the circuit court was whether the defendant exercised its judicial functions erroneously, "that is, illegally and contrary to the course of procedure applicable to the matter before it." *Lechleidner v. Carson*, 156 Or 636, 644, 68 P2d 482; *Asher v. Pitchford*, 167 Or 70, 115 P2d 337. In this connection we may examine the record to determine whether or not there was any substantial evidence to support the findings of the administrator. *Bechtold et al. v. Wilson et al.*, and *Lechleidner v. Carson*, both supra. We may also determine whether the conclusions drawn by the administrator from his findings were clearly wrong, unreasonable or arbitrary. *Richardson v. Neuner*, 183 Or 558, 194 P2d 989.

The majority opinion recites at considerable length the evidence which was presented to the defendant in the hearing. The recital of this evidence leaves the reader in doubt as to whether it is being considered only for its bearing upon the narrow issues which are before us in view of the scope of the writ of review,

or whether, on the other hand, the evidence is being considered by this court as if we were vested with the powers of an appellate administrative tribunal. The time-honored principle that this is a government of laws, and not of men, not only requires that administrative bodies be restrained within their proper field, but also, that judges should not convert the courts into administrative agencies by the usurpation of nonjudicial functions. With this comment I pass on to a consideration of the fundamental question in the case.

The first assignment of error challenges the jurisdiction and power of the defendant to prevent the plaintiff from entering the Salem market in the manner indicated. The real contention raised in the petition for a writ of review was that the plaintiff had a right to purchase milk in the Salem production area, process it in Portland and sell it in Salem without securing any new license at all, and that the defendant had no power to prevent plaintiff from so doing. That contention is the basis of plaintiff's first assignment of error. It is this jurisdictional issue of which the plaintiff says, "The most vital point of this appeal rests upon the first assignment of error."

I am in accord with the majority in the view that the court has no choice except to determine whether the Act confers upon the defendant the power to deny an application for a license to a processor-distributor because of the adverse effect which the granting of the license would have upon the milk industry. If it may, then the question as to whether the field is already adequately served becomes relevant, though not solely determinative. If it may not, then the adequacy of the existing service and all questions as to the effect upon the best interests of a stabilized market

or the likelihood of demoralization of the industry become immaterial.

The petition for a writ of review, among many other specified grounds for attacking the defendant's order, adds the following: "Section 34-1006 OCLA specifies all the grounds upon which a license may be denied and defendant did not deny said license on any of the grounds therein specified." I shall show that the provisions of that identical section require that the defendant give consideration to economic aspects in considering applications for a license.

But my point at the moment is that throughout the brief and oral argument of the plaintiff, two propositions only are seriously argued; first, the question of jurisdiction, and second, the contention that the "order denying the license was based on findings unsupported by substantial evidence and on conclusions which could not be properly drawn from said findings." These issues form the basis for the only assignments of error, two in number. Throughout briefs and oral argument the plaintiff has not challenged the right of the defendant to inquire whether the granting of the license would adversely affect the market. It does not argue that the defendant must disregard the public interest or that increases in costs are irrelevant and stabilization of the industry immaterial. On the contrary, its argument is that there is no evidence to support the findings on those issues. The majority opinion goes, outside of and beyond the argument of the plaintiff and cuts into the very vitals of the milk control system. It does not merely consider whether there was substantial evidence to support the findings. It goes further and, in substance, holds that the findings were made upon immaterial issues, and that, as a consequence, no proper conclusions could be

based upon them. As I read the opinion, the result reached would have been the same if those findings had been supported by the great weight of the evidence. I deem it proper to quote excerpts from the majority opinion which tend to indicate the real basis of the proposed decision. If my analysis of the opinion is correct, then the far-reaching scope thereof should be brought into sharp focus to the end that any change in the judicial construction of the existing law shall be made only after full consideration. If I have misconstrued the meaning of the decision, my error, no doubt, will be pointed out.

What circumstances may be considered by the defendant in exercising the acknowledged power to grant or deny a license after due hearing? Was the defendant entitled to consider the probable effect upon the milk industry in the Salem area if the application of the plaintiff were granted? The opinion of the majority accurately states the position taken by the defendant in its order denying the license. I quote:

"The denial resulted from the defendant's belief that Salem is adequately served by milk processors-distributors and that a grant to the plaintiff of its requested license would be prejudicial to the economic stability of the milk industry."

Obviously, as indicated by the findings, the economic aspects of the case were deemed to be important, if not actually controlling. If, in passing upon the application, the defendant was without authority to consider the economic factors, on the basis of which its decision was made, then, of course, the decision cannot stand, no matter how convincing the evidence may be on those aspects of the case. It is said that the statute makes reasonably clear the circumstances upon which the defendant may grant or deny licenses.

The opinion lists what it deems to be the relevant circumstances which should be considered, as follows: Milk dealers should be capable and responsible; should have adequate personnel and equipment; should not have given indications of inability or unwillingness properly to conduct the business; should maintain adequate records concerning costs of production and expenses of processing and distributing. The court adds: ''We also have in mind the sections which speak of 'natural market areas' and 'territory in which conditions involved in the production, processing and distribution of milk are similar' ''. Again the court says: ''Likewise, the defendant is familiar with the various market areas and of the conditions in them with which a milk dealer must cope.'' It will be seen that, although the court has ''in mind'' the statutory provisions concerning natural market areas and territory in which conditions involved in production, processing and distribution are similar, and although it said that the defendant is familiar with the various market areas and of the conditions in them with which a milk dealer must cope, the court does not say that those conditions known to the defendant may be considered in passing upon the application for a license, and, I fear that the court does not mean to say so, for the entire matter is summed up as follows:

''\* \* \* The question which he must answer after he has analyzed the record is this: Is this applicant equipped to render responsible service in the entire area which he seeks to serve. The defendant is not authorized, however, to deny a license merely because the applicant cannot indict the service which is already being rendered.''

A reading of the entire opinion indicates that the court intends to hold that when a new competing pro-

cessor-distributor seeks to be admitted to the Salem area, the fact that the area is presently being adequately served is not relevant to the issue. In the entire opinion, I find no recognition of any right of the defendant to consider whether or not the licensing of a new processor-distributor to operate in competition with those presently in the field would jeopardize the maintenance of the distributive facilities presently and adequately supplying the needs of the area, or whether it would disrupt the fair distribution of the burden, incident to the disposal of surplus, or whether it would demoralize the production and distribution of milk in the Salem market.

The majority opinion concerning the limited function of the defendant in considering applications for a license presents a question of immense importance to the administrative bodies of this state, in comparison with which the question as to whether there is substantial evidence to support the findings in the instant case becomes one of only local interest.

It is not necessary to search the record for some substantial evidence tending to indicate that the granting of a processor-distributor license would affect and tend to disturb existing conditions in the Salem market. The search has already been made. The majority opinion states as fact that the plaintiff will deal with the Salem trade in a manner different from that employed by the other principal processors-distributors. Its milk will contain a higher precentage of butterfat. It will be sold under a trade name. At present, milk purchased in paper cartons costs the buyer a half cent more than milk in bottles. The plaintiff will eliminate that difference if the buyer chooses Lucerne milk. The milk processed by the major dealers is made available to the consumer by delivery service; not so the milk

to be sold by plaintiff. The plaintiff would buy from the dairyman, thus reducing the total of the milk produced under Salem quotas which will be processed by the present processors-distributors, of which there are five. Producers now selling to the principal processors are subject to the burdens which are imposed by the authorized pooling regulations. That is to say, they get a lower price for surplus milk when such surpluses arise. If the plaintiff buys direct from producers, "it will not be subject to the effects of pools, unless the defendant alters his regulations * * *." In addition to the statements of fact in the majority opinion, there are recitals concerning the evidence offered to show that the effect upon net incomes of present processors would be adverse. The fact that opinion evidence was received raises no question for our determination in this proceeding. The witnesses were experts, and in any event, we do not sit to review the rulings of administrative bodies on the admissibility of evidence, or to weigh that evidence. If the defendant has any authority to consider the effect which the granting of plaintiff's application would have upon the industry and the public; if it could consider its familiarity "with the various market areas and * * * the conditions in them with which a milk dealer must cope"; if it could consider the bearing of probable increasing costs or the necessity for stabilization of the market or the danger of demoralization of production and distribution or the evils of discrimination, then, the pending case is one in which such effects should be considered, not by us, but by the defendant. No opinion need be expressed as to the merits of the milk control law. It may be of doubtful value, but the entire basis of the law, as this court has held, is the establishment of controls limiting competition and

production and prices in the public interest, and by means which we have held to be constitutional.

Let us see if the majority opinion goes beyond the contentions of the plaintiff. This brings us to the case of *State ex rel. Peterson v. Martin*, 180 Or 459, 176 P2d 636. In that case the plaintiff, as Director of the Department of Agriculture, brought suit to enjoin the defendant from selling milk to the public in the city of Sheridan without a license. Defendant claimed that he had a license. The plaintiff replied, in substance, that a certificate manifesting a license was issued without authority and by inadvertence. The trial court enjoined the defendant from selling milk in the city and we affirmed the decree, one judge dissenting. We held that the certificate issued was void and therefore that defendant was without a license to sell and distribute in Sheridan. This portion of our decision has no bearing on the pending case. The portion of the decision which does have importance is that part which considers and determines whether to enjoin Martin from distributing milk in Sheridan, he being without a license.

In April 1945 an application by defendant Martin for a license as a dealer in Sheridan was denied by the Director of Agriculture and a writ of review sued out by Martin was dismissed in the circuit court on 5 November 1945. On 31 December 1945 Martin again applied for a license as producer-distributor, and it was pursuant to this second application—not the one involved in the proceedings on writ of review—that the questions arose which were decided in the Peterson —Martin case. On his appeal to this court Martin argued that "Upon an application for a distributor's license, the Department of Agriculture has no discretion to refuse such a license and must allow the same

unless it appears that the distributor applicant has been guilty of any of the acts set forth in Section 34-1006 O.C.L.A.'' Again he assigned as error the granting of the injunction. The issue presented by Peterson in the Martin appeal was similar to that in the pending case. From his brief I quote:

"Specifically the Legislature provided a method of classifying and limiting licenses as a means of controlling, to some reasonable extent the distribution system existing in the fluid milk industry.

\* \* \* \* \*

"\* \* \* Obviously the only method of controlling distribution so as to remove the evils present therein was to avoid excessive distribution facilities with overlapping routes which inevitably led towards increased costs to the dealer and ultimately increased cost in prices to the consumer."

The brief then urged upon this court the administrative construction of the Act and said:

"\* \* \* This interpretation of the Milk Control Act as affording the power now challenged by the appellant should be decisive of the instant controversy, particularly in light of the fact that the statute has been repeatedly amended and the Legislature has never seen fit to deny or revoke the attempted exercise of power with respect to classification and *limitation of licenses.*" (Italics ours.)

This was said in the year 1946.

In the Peterson-Martin case this court refers to the fact that evidence had been received "under the rule" concerning the adequacy of house-to-house delivery and concerning the alleged superior quality of the milk sold by Martin. The court said:

"\* \* \* Defendant suggests that, under such circumstances, he cannot be charged with having created a public nuisance. Upon that question, how-

ever, (even if it were pertinent, which, in view of the fact that the comparative quality of the milk was not in issue, it was not) the findings of the Circuit Court for Yamhill County were against him. No appeal was taken from that court's decision, and it is now res judicata."

This is the only effect given by this court to the decision on the writ of review case. And it is impossible from the opinion to determine what was the basis of the decision on the writ of review. Certainly it decided no issue which arose after the date of the order which it reviewed. One thing is sure; whatever the grounds of decision in the Peterson-Martin case might have been, the court clearly based the decision on the power of the defendant to refuse a license to a processor-distributor on grounds which had nothing to do with the responsibility or equipment of the applicant. I quote:

"It is contended that the Act does not vest the administrator with discretion whether to issue or to refuse to issue a milk-distributor's license to a properly qualified applicant. The argument is that if the administrator has no discretion to refuse to issue a license, then, by a parity of reasoning, it follows that, except for violation by the licensee of specific provisions of section 34-1006, O.C.L.A., (none of which are involved in the present case) he is without authority to revoke a license."

The "argument" appears to be inescapable. If the administrator had no discretion to issue or to refuse to issue a license, then the court could not enjoin the defendant from selling milk, regardless of the question concerning the unauthorized issuance of the certificate. It will be noted that the court expressly stated that the provisions of OCLA, § 34-1006 were not involved in the case. That is the section concerning the

granting and cancelling of licenses, requiring the keeping of accounts and records, etc. The issue was directly presented by the administrator, and directly decided by the court. The court said:

> "The administrator, on the other hand, insists that the Act is designed to regulate the whole range of activity involved in the production, distribution, manufacture, storage and sale of fluid milk for human consumption. The evils which the legislature sought to remedy included those of cut-throat competition among dealers, excessive and duplicate milk routes, spasmodic and irregular supply of wholesome milk to the consumers, and a depression of prices to the producers. The administrator suggests that it is obvious that, to remedy those evils, the legislature intended to invest him with power to adopt such reasonable regulations as would tend to further the general purposes of the Act. * * *"

The court then quoted the preamble of the Act, which recites the unjust, destructive and demoralizing trade practices which are carried on in the production, sale and distribution of milk, and which impair the dairy industry and constitute a menace to the welfare of the inhabitants. The court considered whether the Act contained sufficient basic standards for the guidance of the administrator and in that connection considered the effect of *Savage v. Martin,* 161 Or 660, 91 P2d 273. The court said:

> "* * * Section 34-1009, O.C.L.A., empowers the administrator to classify licenses, to limit them to a particular city or village, or to a particular market or markets, and to define what shall constitute a natural market area. A market is defined to include ordinarily no more than one city or town together with reasonably contiguous territory. When two or more towns or cities are so closely adjacent to one another that they comprise but one natural market area and are subject to the

same marketing conditions, such adjacent towns or cities and contiguous territory may be included in one market area. A market area may include only territory in which conditions involved in the processing and distribution of milk are similar. It was necessary, of course, to leave to the determination of the administrator the question of the existence of the required facts upon which the status of an area as a natural market depends. * * *''

After reviewing the authorities, the court continued:

''We hold that the standards set up by the Act are sufficiently adequate to guide the administrator in his determination of the propriety of issuing or refusing to issue a license.''

Applying that conclusion to the facts of the case, the court stated its conclusion as follows:

''* * * As the administrator had determined that the Sheridan market was already adequately served, and that the granting of a license to an additional distributor to sell milk therein would be economically wasteful, not in the public interest, and harmful to a stabilized production and distribution of fluid milk and cream for human consumption, we are of the opinion that the refusal of the administrator to permit Mr. Martin to enter the Sheridan market area was a reasonable exercise of a valid discretionary power vested in the administrator by the Act. The existence of facts justifying the administrator's action, after due notice and a hearing, is presumed, and there was no competent evidence in the record to overcome such presumption.''

In my opinion, a reading of the last-mentioned case will conclusively demonstrate that what was said was not dictum, and was adopted by the court after deliberation and notwithstanding a dissent by the author of the majority opinion in the pending case. The stabilization of the law by means of adherence to

sound precedent is at least as important as the stabilization of the milk industry. The decision in *State ex rel. Peterson v. Martin* should not be overruled.

The majority opinion, as we have shown, lists conditions which must be met before the defendant is authorized to issue a license. They relate to the equipment of the applicant "to render responsible service in the entire area which he seeks to serve." These conditions are not imposed out of solicitude for the applicant, or to keep him from financial loss by reason of his entry into a field which he cannot adequately supply. The conditions are imposed for the benefit of no particular individual, but to prevent the disruption of the milk industry by the entry into the competitive field of ill-equipped or irresponsible dealers.

The findings and conclusions of the defendant were not made merely because the Salem market was adequately served, or because of an adverse effect upon the interveners. The findings themselves demonstrate that the license was denied because of the prospective adverse effect upon the milk industry in the Salem area, which is illustrated by the testimony of the two principal processor-distributors therein. The statement in the majority opinion that in buying from producers the plaintiff would "not be subject to the effects of pools" is of particular importance. It supports the contention of the defendant that the granting of a license to plaintiff would tend to demoralize the market, both in respect to production and distribution. If plaintiff would not be subject to the effects of pools, then the losses resulting from surplus milk pools would be borne wholly by others unless the pooling system were changed.

The legislature has empowered the defendant to regulate the milk industry, including manufacture, dis-

tribution and sale. OCLA, § 34-1003 as amended by Laws 1951, chapter 639. But this is not the only authority vested in the defendant. It is directed to ascertain what prices in each locality and market area will best protect the milk industry in the public interest. OCLA, § 34-1012 as amended by Laws 1951, chapter 397. The same statute requires that the Board shall take into consideration all conditions affecting the milk industry, including the prices necessary to produce a reasonable return, both to the producer and to the milk dealer. The 1951 amendment specifically authorizes the defendant to take into consideration reasonable unit costs of hauling, processing, selling and delivering. After investigation, the defendant is directed to fix minimum prices.

"The board may classify licenses and may issue licenses to dealers to store or manufacture or sell milk limited to a particular city or village or to a particular market or markets within the state, and may define what shall constitute a natural market area and define and fix the limits of the milkshed or territorial area within which milk shall be produced to supply any such marketing area . * * *." OCLA, § 34-1009.

Can it be said that the defendant can insure a reasonable return to the milk dealer if it is powerless to control the number of dealers who operate processing plants in a given market area? The defendant is further authorized to define and limit the geographical area from which the fluid milk shall be produced for any given market. It may determine under uniform rules what proportion of the milk "produced by each producer shall be considered as marketed as fluid milk for human consumption and what proportion so produced shall be considered as surplus." It may provide for pooling of both. OCLA, § 34-1013. The license

issued to the plaintiff for the Lucerne Milk Company expressly provides that the plaintiff may, under that license, operate as a processor-distributor in the Portland sales area. In the light of the statutory provisions, the license should be construed to mean that the plaintiff, through its Lucerne plant, may process milk and distribute the same in the Portland sales area. Employing the words of the statute, plaintiff may manufacture (process) and sell milk limited to a particular market or markets, namely, the Portland market. The only other conceivable construction would be to hold that the processor-distributor license was, in effect, two separate licenses, one to process and one to distribute. The dismembered processing license would then mean merely that the defendant may limit the location of the processing plant to a particular city or market. This construction would leave any licensee who has a processing plant anywhere in the state free to enter any production area in the state, buy milk from producers and sell it in the corresponding sales area. Under the theory of the majority opinion, the defendant would be powerless to interfere except to see that a competitor, having no license, and seeking one, should be equipped to render responsible service. On this theory, the more powerful the invading competitor in the processing field, the more destructive would be his competition and the less would be the power of the state through its agency to control market conditions. Any such construction would emasculate the Act and withdraw from the defendant the power to consider in the issuance of licenses the facts relevant to the chief purpose of the Act, namely, the elimination of economic evils through uncontrolled competition.

Three separate provisions of the statute require a liberal interpretation of the power of the defendant.

The defendant may adopt rules and orders necessary to carry out the provisions of the Act. § 34-1003. This provision undoubtedly applies to the authority to fix prices. Again, in connection with the power to define production and marketing areas and to establish pools, the defendant may make any other order or exercise such further power as may be necessary for the full accomplishment of the aforesaid objects. OCLA, § 34-1013. Again it is provided that the Board shall have power to make all necessary rules and orders to carry out the true intent and purpose of the Act. OCLA, § 34-1015. All of the expressly enumerated powers have been upheld by the court. The defendant has not been given unfettered discretion by the three general provisions to which reference has been made. This court sits to see that the exercise of these implementing powers is limited and can only be employed to carry out the true intent and purpose of the Act, which purpose has already been defined by this court.

From a recent treatise I quote pertinent passages:

"Where there is ample provision for notice, hearing, and argument, and where it is thought these sufficiently guarantee a fair and intelligent disposition of the case by informed and impartial administrative action, broad standards are likely to be upheld.

"Where provisions for judicial review permit the court to exercise a large measure of superintending control over the agency, this reasoning is even more effective in persuading the courts to sustain statutes setting up a very vague standard." Cooper, Administrative Agencies and the Courts, pp 43, 44.

In *American Power and Light Co. v. Securities and Exchange Commission,* 329 US 90, 91 L ed 103, this problem received scholarly attention in the light of the

realities of modern industry and the practical limitations upon legislative measures for the regulation of complex industrial and commercial activities. The statute for the guidance of administrative action provided only the broadest general standards. The United States Supreme Court said:

"* * * They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear.
* * *

"The judicial approval accorded these 'broad' standards for administrative action is a reflection of the necessities of modern legislation dealing with complex economic and social problems. See Sunshine Anthracite Coal Co. v. Adkins, 310 US 381, 398, 84 L ed 1263, 1273, 60 S Ct 907. The legislative process would frequently bog down if Congress were constitutionally required to appraise beforehand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. Private rights are protected by access to the courts to test the application of the policy in the light of these legislative declarations. Such is the situation here."

And see *Opp Cotton Mills, Inc. v. Administrator of Wage and Hour Division of Department of Labor,* 312 US 126, 85 L ed 624; *Carlson v. Landon,* 342 US 524, 96 L ed 547; *Yakus v. United States,* 321 US 414, 88 L ed 834.

We have repeatedly said that "The evils which the Oregon Milk Control Law are intended to correct are chiefly economic ones." *Savage v. Martin,* 161 Or 660,

91 P2d 273. See also *State ex rel. Peterson v. Woodruff,* 179 Or 640, 173 P2d 961. Considering the Act as a whole, it is apparent that control through the exercise of the licensing power is an integral part of the entire program, the avowed purpose of which is the stabilization and control of the industry.

Surely, the majority does not now intend to strike down the entire Act by judicial fiat. Its constitutionality was established in 1939 notwithstanding a dissent by three members of the court, including the author of the majority opinion in the pending case. I have high regard for judicial firmness, once considered conviction has been reached, but in cases of this kind, the time should come when individual opinion must give way to precedent. In *Savage v. Martin,* supra, (1939) this court upheld the validity of the provisions authorizing price-fixing, the establishment of quotas and pools and the provisions vesting in the defendant power to define and limit the geographical area from which fluid milk shall be produced for any given market or sales area. It was held in that case, at page 681, that the statute was enacted "primarily to promote the public interest by relieving those in the milk industry from hazards to which it is exposed in an uncontrolled market." It was further held that:

"* * * The standards set up, in our opinion, are legally sufficient and the legislature has not delegated its power to make law, but has only conferred upon the board authority to make administrative rules (United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563) in carrying out the legislative policy. * * *"

Relying upon this and subsequent decisions, the legislature has seen fit to continue and from time to time modify the administrative set-up which now

exercises supervision and control over a multi-million dollar industry. Other legislative acts establishing administrative agencies have been passed having in view the legislative principles established by this court realtive to administrative powers and the delegation thereof. The legislature has not set up a separate specific yardstick as a standard limiting administrative action concerning prices, another concerning quota, another for pools, and so on, for production and market areas and the like. All of those powers are clearly limited by the expressed policy of the entire Act which looks toward stabilization of the industry by the elimination of uncontrolled competition. The exercise of the powers is limited, not alone by statutory phases, but also by the duty of this court to strike down arbitrary administrative action wherever found. If this court deprives the defendant of power to consider the economic effect of its action in granting or withholding processors' licenses, the door will be opened for unrestricted competition at the very heart of the milk industry, with the result that the exercise of the other powers vested in the defendant and confirmed by this court will be ineffective for the accomplishment of the legislative purpose.

One additional provision of the statute merits attention. OCLA, § 34-1006 expressly authorizes the defendant to decline to grant or to revoke a license when it appears "that a milk dealer has committed any act injurious to the public health, welfare or to trade or commerce in milk to such an extent as to obstruct the purposes of this act * * *." The text of the quoted provision is perhaps not fortunate, but its purpose is clear. If a licensed milk dealer may lose his license because of acts injurious to trade or commerce in milk such as to obstruct the purposes of the

act, then, the legislative intent is apparent that the defendant may decline to grant a license if the granting of it would result in a condition which would authorize its revocation.

Now let us see what is the basis of the majority decision. The defendant contends that the processor-distributor license issued to plaintiff limits it to processing and distributing milk in and for the Portland market and that if plaintiff desires to process milk from the Salem production area in Portland and sell it in Salem it must have a processor-distributor license which is not limited (as is its present one) to a particular city or village or particular market or markets, to wit, the city of Portland and the Portland market area but which covers the Salem area. Thus far, it appears that the majority opinion agrees. I quote:

> "* * * The plaintiff's Portland processing plant [Lucerne] has a license issued by the defendant which authorizes it to process milk for sale in the Portland market area only. * * *"

Again I quote therefrom:

> "* * * we see that the defendant possesses authority to restrict a milk dealer to a single market or authorize him to process for and sell milk in more than one. * * *"

Again I quote:

> "* * * The act * * * deems that licensing consists, not only of determining which applications should be granted and which rejected, but also the number of markets which should be assigned to a licensee. * * *"

I agree. Thus, the basis of the majority opinion is clear. On the one hand the plaintiff challenged jurisdiction, and as a second-ditch defense argued that there was no substantial evidence to support the findings

and decisions of defendant. On the other hand, the majority opinion assumes that the defendant had jurisdiction to grant or deny a new license but that the denial of a license was based upon considerations which the law does not permit the defendant to entertain. Let us see if the majority opinion goes beyond the contentions of the plaintiff. The decision is directly opposed to the decision in *Peterson v. Martin*. The defendant in the pending case relied upon *Peterson v. Martin* as a decision on the "precise question." The plaintiff made no attack upon the authority of that case, but in fact, tried unsuccessfully to distinguish it.

I have yet to be told how this court could have granted an injunction restraining the defendant Martin from selling milk in Sheridan unless it held, first, that the defendant had power to grant or deny licenses, and second, that a license should not be granted for the reasons set forth in the opinion of the court, none of which related to the responsibility or equipment of the defendant. If there be any innovation in this case, it is not to be found in the dissent.

A further word with respect to the pooling provisions of the statute is in order. Section 34-1013, OCLA provides, in substance, that the defendant shall have power, under uniform rules and regulations to determine "what proportion of the milk produced by each producer shall be considered as marketed as fluid milk for human consumption and what proportion so produced shall be considered as surplus; and (c) to provide for the pooling and averaging of all returns * * * subject to such rules and regulations as may be imposed for the control of surplus production * * *." If the plaintiff should be permitted to purchase milk from producers in the Salem area, process it in Portland and sell it in its Salem stores, the producers who

sold milk to the plaintiff would not be subject to the burden of having part of their product classified as surplus at a lower price and this, as found by the defendant, would throw the burden of the surplus upon all producers other than those supplying Safeway stores. The majority opinion states that "the plaintiff will not be subject to the effects of pools, unless the defendant alters his regulations whereby some producers supply the Curly pool and others the Mayflower."

I suggested the economic complications which would arise in the production field if there were two pools in Salem and if, in addition, the plaintiff was buying from producers who were subject to no pool at all. If it be intimated that the two-pool system in Salem is illegal under OCLA, § 34-1013, I should be compelled to differ. We must not overlook OCLA, § 34-1016 which exempts cooperative associations from the provisions of OCLA, § 34-1013 which would otherwise govern and which asserts the right of cooperatives to a pool of their own. Mayflower is a cooperative association. What would be the economic effects on producers of a system whereby two groups received their proceeds from different pools at different rates and a third group was wholly free from the burden of pools and surpluses, is not for this court to determine. It presents a question for experts, and the decision would be one affecting producers more than processors-distributors.

The concurring opinions are supported by eloquently expressed economic views, personally held, concerning the evils of controlled economics and the blessings of free enterprise. If those views are sound, as they may be, they should be addressed to the legislature, or to the voters, rather than to the courts. For

this reason I withhold comment. I agree that the depression of the thirties' has long since passed, but I question the relevancy of that comment in view of the fact that the Act was upheld in 1939 and again in 1947. Was it intended to intimate at this late date that the legislature is without power to establish economic controls because no depression now exists?

I propose no departure from established law or from an administrative construction which preceded our decisions and was confirmed by them over a total period of twenty years. I do protest what I deem to be an overruling of a decision, the doctrine of which was clear and which was without legal challenge until challenged by the court which rendered the decision. The dissent of Mr. Justice LUSK, in which I join, sets forth compelling reasons why this court should not, and in fact, cannot, change the law at this time without usurping legislative power. If the administration of the law as construed by this court has been injurious to the dairyman or to the public, the fact has not been brought to our attention in this case, but it may be brought to the attention of the legislature now in session.

I do not contend that the defendant has power to deny a license to a processor merely because the defendant "believes" that sufficient milk service is already being rendered to the community. The defendant has no right to deny a license merely because he believes - - -. He holds a hearing, receives evidence and makes findings which must be supported by evidence and must not be arbitrary. He is not controlled by a single issue, i.e., whether sufficient milk service is already being rendered. He is empowered to consider what the effect of granting the license would be upon the stability of the milk industry

and the economic welfare of producer and dealer and public. Among other matters, he may consider the adequacy or inadequacy of existing service.

No contention is here made that the processor or distributor should be substituted as the object of the Act's solicitude. The interest of producer and public is no doubt paramount, but the extraordinary limitation which the majority now places upon the licensing power affects not only the processor-distributor but his relations to the producer and to the public and to that extent, it strikes at the heart of the milk industry.

I do not advocate a defense of the status quo or the protection of monopoly. I do contend that the function of the defendant is not limited by statute to the wielding of a rubber stamp marked "approved" on every application for a license by one who is financially responsible and well equipped, but that the statute, considered as a whole, and viewed in the light of years of administrative and judicial construction, empowers the defendant to consider the broader economic aspects of the case with due regard for the interests of producer, distributor, and the public. If the defendant has abused its power, the judicial remedy is to correct the abuse, not to abolish the power. The latter function is legislative. For these reasons, I dissent.

LUSK, J. (dissenting).

Mr. Justice BRAND's dissenting opinion, in which I join, sufficiently states the reasons why I cannot concur in the court's opinion. I have little to add to what he has written other than to express my concern over the majority's cavalier treatment of a controlling precedent of this court. I refer to *State ex rel. Peterson v. Martin*, 180 Or 459, 176 P2d 636 (hereinafter referred to as the Martin case). That case decided that the director of agriculture, as administrator

of the Milk Control Act (now known as the Milk Marketing Act, § 4, ch 449, Oregon Laws 1949), was authorized under the statute to deny a dealer's application for a license to distribute milk in a town because of the fact that the particular market was already adequately served. The basis of the decision is that the economic considerations which brought about the passage of the Act, and which underlie its policy, may guide the discretion of the official administering the Act in passing upon an application for a dealer's license. The case was heard by the full court, and the decision was concurred in by six judges, one judge dissenting. Without argument upon the point three judges now overrule this decision. One member of the majority insists that it is not necessary to overrule, but only to "clarify," the Martin case. But, to clarify a decision by refusing to accept its *ratio decidendi*, is still, I am persuaded, to overrule it.

Neither in the brief nor on the oral argument have counsel for the plaintiff here questioned the Martin case. There has been no suggestion from that source that it be overruled. There was an attempt to distinguish it, but both parties treated it as the law. They differed only as to its applicability to the facts of this case. The decision was rendered January 15, 1947, two days after the convening of the 44th regular session of the Oregon Legislative Assembly. In the intervening time there have been two such sessions, and now a third is in progress and has been since January 12, 1953. During these years the Milk Control Act has not been a forgotten law. Efforts to repeal it in the 1949 and 1951 sessions failed: Senate Bill 4, Senate and House Journal 1949, p. 795; House Bill 98, idem., p. 705; Senate Bill 219, Senate and House Journal 1951, p.

637; House Bill 6, idem., p. 676. Attempted amendments were Senate Bill 340, Senate and House Journal 1949, p. 735; House Bill 564, Senate and House Journal 1951, p. 758; and House Bill 269, idem., p. 716. House Bill 564 would have amended § 34-1009, OCLA, the construction of which was directly involved in the Martin case, as it is in this case. House Bill 269 calls for more extended reference. Further, the Act has been amended in particulars not now relevant: Ch 547, Oregon Laws 1947; ch 369, Oregon Laws 1951.

House Bill 269, introduced and rejected in the 1951 session, has an important bearing upon the present question. One of its apparent purposes was to eliminate the fixing of minimum prices for milk except as to producers and producer-distributors. Another manifest purpose was to change the law as established in the Martin case. This would have been accomplished by amending § 34-1006, OCLA, by insertion of the word "only" in the opening clause of that section so as to make it read as follows: "The board may decline to grant the license, or may suspend or revoke a license of any applicant, upon due notice and opportunity to the applicant to be heard, *only* when it appears", etc. Then follow the grounds for refusing, suspending or revoking a license found in the present § 34-1006, OCLA. These, of course, would have been the only grounds for such action had the bill been enacted into law. The law then would have been what the court's decision in this case declares it to be, notwithstanding the failure of the legislature to pass House Bill 296. The defendant in the Martin case was a producer-distributor.

If House Bill 269 had been the law at the time of that decision this court could not have approved the administrator's action in denying Martin's appli-

cation for a license to sell and distribute milk within the city of Sheridan on the ground that the granting of such license would result in a surplus of fluid milk, and thereby bring about a condition not in the public interest and harmful to a stabilized production and distribution of fluid milk. The legislature, however, did not see fit to change the existing law in this regard. The majority report of the committee on food and dairying recommending that the bill do not pass was adopted and the bill indefinitely postponed by the House. Senate and House Journal 1951, pp. 716, 456, 457.

In my opinion, the failure of the legislature since the decision in the Martin case to give further expression to its will with respect to the interpretation of the statute which we then adopted, amounts, in the circumstances which I have outlined, to legislative approval of that interpretation. In 50 Am Jur 318, Statutes, § 36, it is said:

"* * * In this respect, it has been declared that where a judicial construction has been placed upon the language of a statute for a long period of time, so that there has been abundant opportunity for the lawmaking power to give further expression to its will, the failure to do so amounts to legislative approval and ratification of the construction placed upon the statute by the courts, and that such construction should generally be adhered to, leaving it to the legislature to amend the law should a change be deemed necessary. These rules are particularly applicable where an amendment is presented to the legislature and fails of enactment, or where the statute is amended in other particulars."

The foregoing is supported by citations in the notes to many decisions of the Supreme Court of the United States and of the state courts.

As I have shown, in the sessions of the legislative assembly which have been held since the Martin case, amendments to the Milk Control Act have been adopted, and many attempts to amend it have been made without success. The Act has always been the object of the solicitude of the lawmakers. Among the proposed amendments which have failed is House Bill 269 in the 1951 session, which would have changed the law so as to nullify the Martin decision. This change, which the legislature refused to make, is effected by today's decision. And this is done without even according to a responsible state official, charged with the duty of administering the law, and who presumably has relied on this court's decision in his official acts, an opportunity to be heard on the question. For notwithstanding any grounds for relief that may have been stated by plaintiff in the petition for writ of review, I repeat, and I think it will not be challenged, that in this court plaintiff has not argued, or even suggested, either in printed brief or oral argument, that the construction of the statute announced in the Martin case is erroneous, and has not urged, or even intimated, that we should overrule that decision.

There is a further consideration which, in my opinion, should be held to be conclusive of the question. In January, 1953, the legislative assembly now in session passed, and the governor on January 26 signed, House Bill 2, thereby enacting into law the statutes of this state as revised by a commission appointed for that purpose. The name of the new code is Oregon Revised Statutes. Section 1 of the Act provides "The statute laws set forth after section 8 of this Act hereby are enacted as law of the State of Oregon." The Act by its terms is to become effective December 31, 1953. The

provisions of §§ 34-1001 to 34-1018, OCLA, with their amendments, which constitute the present Milk Control Act, are re-enacted without any change in substance whatever by House Bill 2, including the present §§ 34-1005, 34-1006 and 34-1009, OCLA, which deal with licenses. In fact, except for necessary formal changes, the language of the re-enactment appears to be identical with that used in OCLA. Section 34-1005, OCLA, is 583.320, ORS; § 34-1006, OCLA, is 583.340, ORS; and § 34-1009, OCLA, is found in three sections of ORS as follows: 583.100, 583:110, 583.330. It is a well recognized rule of statutory construction that "when a statute or a clause or provision thereof has been construed by a court of last resort, and the same is substantially re-enacted, the legislature may be regarded as adopting such construction." 40 Am Jur 461, Statutes, § 442. This court has applied the rule in a number of cases. *Lindeman v. State Indus. Acc. Comm.*, 183 Or 245, 254, 192 P2d 732; *State v. Raper*, 174 Or 252, 255, 149 P2d 165; *Overland v. Jackson*, 128 Or 455, 463, 275 P 21. See, also, annotation, 65 L ed 106 et seq., where are cited decisions of the United States Supreme Court, the lower federal courts, and the appellate courts of 27 states supporting this rule. Particularly apposite is *Lindeman v. State Indus. Acc. Comm.*, supra, in which this court was urged to overrule a decision construing a provision of the Workmen's Compensation Act. The court, in an opinion by Mr. Justice BAILEY, said:

"We see no reason why we should overrule the Gerber case. It was decided after a thorough consideration of the identical question here presented. Since the decision in that case in 1940, there have been four sessions of the legislature and the only change made in § 102-1771 (c) was to enlarge, in

1945, the time in which to file an application for increased compensation for aggravation from one to two years. *It may be presumed that the legislature re-enacted this section with knowledge of the ruling in the Gerber case, and that when it embodied in the 1945 enactment the precise words of the statute which had been construed in the Gerber case it intended to adopt the construction which had been placed thereon by the court in that case.* Overland v. Jackson, 128 Or 455, 275 P. 21; 50 Am. Jur., Statutes, 461, § 442." (Italics added.) 183 Or 254.

In the case of revised statutes and codes the courts apply the same presumption. As stated in 50 Am Jur 469, Statutes, § 455, "where a statute which has previously received a judicial construction is included in a code, it will be presumed that the intention was to adopt the construction given the statute by the court, and the code provision will be so construed, where no purpose to make a substantial change in the law appears." See, also, authorities cited in annotation, 65 L ed 108. An examination of the Milk Control Act, as revised in ORS, shows that no substantial change has been made, and this is in accordance with the direction of the legislature that the Statute Revision Council should codify and revise the laws in this state without altering the sense. Oregon Laws 1949, ch 317, § 3.

There are exceptional cases in which, under circumstances not present here, courts have refused to apply this rule of construction. In view of the legislative history and other matters to which I have called attention, that is not the course which should be now pursued. It is highly regretable that a minority of the court should undertake to do so.

I am authorized to say that Mr. Justice BRAND concurs in this opinion.